**In the Matter of Lorraine BLILIE.**

**No. C6–91–2444.**

Supreme Court of Minnesota.

Jan. 22, 1993.

Peter M. Rosene, Andrew E. Staab, Rosene & Haugrud, Chartered, St. Paul, for appellant.

Hubert H. Humphrey, III, Atty. Gen., David P. Iverson, Sp. Asst. Atty. Gen., St. Paul, for Com'r of Human Services.

Richard H. Hoffman, Asst. Ramsey County Atty., St. Paul, for Ramsey County.

KEITH, Chief Justice.

Lorraine Blilie ("Blilie") is a 54–year–old woman who has been diagnosed with developmental disabilities (i.e., mental retardation) and mental illness. She has a secondary diagnosis of conduct disorder, undersocialized aggressive.

Blilie was born on March 14, 1938, and in January 1952, at the age of 13, she was committed to Owatonna State School as mentally deficient, with the Director of Public Institutions appointed guardian. She was later placed in Rochester State Hospital and on July 4, 1957, was sent to Cambridge State Hospital ("Cambridge").

Between 1952 and 1984, Blilie remained at Cambridge without judicial action being taken. The statutes governing commitment and guardianship, however, were modified, with Minn.Stat. ch. 253A replac-

ing Minn.Stat. §§ 525.749–.79 (1949). This statute was, in turn, replaced by Minn.Stat. ch. 253B, the current commitment act, effective August 1, 1982. Minnesota Commitment Act of 1982, ch. 581, 1982 Minn. Laws 1329.

Pursuant to Minn.Stat. § 253B.12, a hearing was held in 1984 on the continued commitment of Blilie as a mentally retarded person. At that time, she was being treated with various types of neuroleptic medication. The court extended her commitment for an indefinite period, finding that she continued to engage in maladaptive behavior and was unlikely to provide the necessary food, clothing, shelter, and medical care for herself.

In 1987, another commitment hearing was held in response to this court's requirement that all indeterminate commitments be reviewed at least every three years. *In re Harhut*, 385 N.W.2d 305, 312 (Minn. 1986). The trial court found that she needed supervision and care on a 24–hour basis and that she had delusional thinking, loose associations, and was aggressive to others. The court determined, however, that if the hospital wanted to continue to treat her with neuroleptics, they would have to get a *Jarvis* order. *See Jarvis v. Levine*, 418 N.W.2d 139 (Minn.1988). This court-ordered commitment was due to expire on March 12, 1990.

On April 30, 1990, another commitment petition was brought. The court confirmed the diagnosis of mild mental retardation and conduct disorder, but concluded that she should be placed in the community because Cambridge was a more restrictive placement than Blilie needed. The court also noted that Blilie was still being treated with neuroleptics without a *Jarvis* hearing. In an order dated August 17, 1990, the court denied the petition for judicial commitment. Blilie nevertheless continued to reside at Cambridge, apparently because no appropriate community placement was available.

A new petition was filed on September 26, 1990, and the court once again determined that continued commitment was unnecessary because her condition had not changed from the time of the previous petition. Blilie remained at Cambridge, however, despite the court's finding that the lack of funding for alternative placement was not an acceptable reason for continuing to commit her to Cambridge.

On May 29, 1991, Blilie's counsel petitioned the district court pursuant to Minn. Stat. § 252A.19, subd. 2 (1990), requesting that the court hold that the original appointment of the commissioner as guardian was terminated in 1968 by the repeal of Minn.Stat. § 525.753 (1949), that the court declare Minn.Stat. § 253B.03, subd. 6a (Supp.1991), unconstitutional because it authorizes neuroleptic treatment upon guardian consent without court review, and that the court order the commissioner to show cause why she continued to provide residential services to Blilie at Cambridge without a commitment. The trial court denied the petition in its entirety. The court of appeals affirmed. 484 N.W.2d 34.

On January 2, 1992, Blilie was discharged from Cambridge and transferred to a private residential placement facility. The Commissioner claims that this action makes this appeal moot because the state no longer provides residential services or neuroleptic drugs to her. Blilie opposes this motion and continues to challenge the statute on appeal.

I.

Blilie asserts that her guardianship was terminated upon repeal of the guardianship statute under which she was committed. When Blilie was committed, the statute provided: "If the patient is found to be mentally deficient or epileptic, the court shall appoint the director guardian of his person and commit him to the care and custody of such director." Minn.Stat. § 525.753, subd. 2 (1949). This statute was part of the general commitment statute. *See* Minn.Stat. §§ 525.749–.79 (1949).

In 1968, this statute was repealed and replaced by Minn.Stat. ch. 253A. Minnesota Hospitalization and Commitment Act, ch. 638, 1967 Minn.Laws 1294. The new statute contained a savings clause, *see* Minn. Stat. § 253A.21, subd. 7 (1967), but the

duties of the commissioner as public guardian continued to be governed by the general guardianship provisions of Minn.Stat. §§ 525.54–.612, which are still in effect today. *See* Minn.Stat. §§ 525.539–.705 (1992). Contrary to Blilie's assertion, the savings provision addressed only the commitment status of previously committed persons, not the guardianship status of those individuals.

■ Blilie next claims that the adoption of the Mental Retardation Protection Act, Minn.Stat. ch. 252A, with the corresponding repeal of section 253A.07, subd. 17(b), indicates that all public guardianships created under the prior statute would terminate. What this statute did, instead, was separate the responsibilities of the commissioner as public guardian from the commitment proceedings of chapter 253A and the general guardianship provisions of chapter 525. Instead of repealing prior guardianships, chapter 252A was intended to apply to all public guardianships, including Blilie's, that were previously governed by the general guardianship provisions of chapter 525.

In 1982, chapter 253A was repealed and replaced by chapter 253B, the current commitment statute. Minnesota Commitment Act of 1982, ch. 581, 1982 Minn.Laws 1329. Chapter 253B, like its predecessor, contained a savings clause, which provides that:

> For persons 16 years or older, involuntarily residing in a regional center pursuant to an order of guardianship, and not committed pursuant to an order issued under Minnesota Statutes, chapter 253B, or Minnesota Statutes 1980, chapter 253A, the following review procedures will apply:
>
> (a) The person shall have a commitment hearing according to Minnesota Statutes, section 253B.08, prior to August 1, 1985. The head of the regional center shall notify the responsible county which shall initiate the petition for commitment.
>
> \* \* \* \* \* \*
>
> (c) A finding by the committing court that the individual does not satisfy the commitment criteria of Minnesota Statutes, chapter 253B, *shall not terminate the guardianship or constitute a restoration to capacity. An order of restoration to capacity may only be obtained under Minnesota Statutes, section 525.61.*

Act of May 2, 1984, ch. 623, § 10, 1984 Minn.Laws 1555, 1559–60 (emphasis added). This language evidences a legislative intent to continue guardianships until they are explicitly terminated under the general guardianship provisions of chapter 525. There is no indication that the repeal of the earlier commitment statutes extinguished Blilie's public guardianship. Instead, the commissioner, ward, or any interested person must petition the court to restore Blilie to capacity. *See* Minn.Stat. § 252A.19, subd. 2 (1992); Minn.Stat. § 525.61, subd. 1 (1992). We hold that, absent such a petition, Blilie's guardianship continues.

## II.

■ Blilie also contends that her right to privacy was not adequately protected because the statutory scheme subjects mentally retarded or developmentally disabled persons to intrusive forms of therapy without any independent judicial review. Blilie asserts that the approval system, whereby the hospital staff prescribes neuroleptic medication and the public guardian approves, inadequately protects her right to privacy because the state, or its delegate, is both recommending the treatment and approving it as public guardian.

■ Respondent counters that the statute itself provides support for the commissioner's actions and further asserts that the case itself is moot because Blilie was discharged from Cambridge on January 3, 1992, is no longer being treated with neuroleptic medication by the commissioner, and is now residing at a private residential placement facility. With respect to this mootness challenge, however, this case is "capable of repetition yet evading review," *In re Schmidt*, 443 N.W.2d 824, 826 (Minn. 1989), because Minn.Stat. § 525.56, subd. 3(1) (1990) authorizes a guardian to admit a ward to a treatment center for temporary

care for up to 90 days. Neuroleptic medication may be administered during this temporary stay, thereby indicating that this issue may recur and yet evade review. *See Schmidt*, 443 N.W.2d at 826. Thus, this court chooses to reach the merits of Blilie's claim.

 In evaluating challenges to the constitutionality of statutes, this court recognizes that the interpretation of statutes is a question of law, *Hibbing Educ. Ass'n v. Public Employment Relations Bd.*, 369 N.W.2d 527, 529 (Minn.1985), and this court "is not bound by the lower court's conclusions." *Sherek v. Independent Sch. Dist. No. 699, Gilbert*, 449 N.W.2d 434, 436 (Minn.1990). However, a duly-enacted statute carries with it "a presumption of constitutionality," *State v. Hamm*, 423 N.W.2d 379, 380 (Minn.1988), and a party challenging the statute must establish beyond a reasonable doubt that the statute violates a claimed right. *Id.*

The primary issue raised on appeal is whether the state should be enjoined from providing intrusive therapy, such as neuroleptic drugs, without the consent of a nonpublic guardian ad litem or court order. The first case to address the proper procedural protections was *Price v. Sheppard*, 307 Minn. 250, 239 N.W.2d 905 (1976). In *Price*, this court established the procedures that state institutions must follow:

(1) If the patient is incompetent to give consent or refuses consent or his guardian other than persons responsible for his commitment also refuses his consent, before more intrusive forms of treatment may be utilized, the medical director of the state hospital must petition the probate division of the county court in the county in which the hospital is located for an order authorizing the prescribed treatment;

(2) the court shall appoint a guardian ad litem to represent the interests of the patient;

(3) in an adversary proceeding, pursuant to the petition, the court shall determine the necessity and reasonableness of the prescribed treatment.

*Price*, 307 Minn. at 262, 239 N.W.2d at 913 (footnotes omitted). The procedures were mandated for intrusive therapy such as electroconvulsive therapy and psychosurgery in *Price*, and in *Jarvis v. Levine*, 418 N.W.2d 139, 150 (Minn.1989), this court extended these procedures to mentally ill patients being treated involuntarily with neuroleptic medication.

In response to these cases, the statute was amended to guarantee procedural rights to mentally ill patients. Specifically, the following provision was added to section 253B.03:

Subd. 6a. **Administration of neuroleptic medications.**

\* \* \* \* \* \*

(c) A neuroleptic medication may be administered to a patient who is not competent to consent to neuroleptic medications only if a court approves the administration of neuroleptic medication or:

(1) the patient does not object to or refuse the medication;

(2) a guardian ad litem appointed by the court with authority to consent to neuroleptic medications gives written, informed consent to the administration of the neuroleptic medication; and

(3) a multidisciplinary treatment review panel composed of persons who are not engaged in providing direct care to the patient gives written approval to administration of the neuroleptic medication.

Act of April 28, 1988, ch. 689, art. 2, § 119, subd. 6a(c), 1988 Minn.Laws 1279, 1363 (codified at Minn.Stat. § 253B.03, subd. 6c (1992)). In *In re Schmidt*, 443 N.W.2d 824, 827 (Minn.1989), this court held that these statutory procedures were constitutional and within the standards outlined in *Price* and *Jarvis*. In upholding these provisions, the *Schmidt* court noted that approval for such intrusive treatment must not rest solely in the discretion of the medical personnel at the state institution. *Id.*

In 1991, the statute was amended further, with new provisions on the treatment of mentally retarded persons and mental health patients inserted into subdivisions 6a and 6b, respectively. Act of May 22, 1991, ch. 148, § 2, 1991 Minn.Laws 308.

The section on neuroleptic medication was transferred to subdivision 6c. As amended, this statute provides, in pertinent part:

Subd. 6a. **Consent for treatment for mental retardation.** A patient with mental retardation, or the patient's guardian or conservator, has the right to give or withhold consent before:

(1) the implementation of any aversive or deprivation procedure except for emergency procedures permitted in rules of the commissioner adopted under section 245.825; or

(2) the administration of psychotropic medication.

Subd. 6b. **Consent for mental health treatment.**

\* \* \* \* \* \*

Subd. 6c. **Administration of neuroleptic medications.**

(a) Neuroleptic medications may be administered to persons committed as mentally ill or mentally ill and dangerous only as described in this subdivision.

(b) A neuroleptic medication may be administered to a patient who is competent to consent to neuroleptic medications if the patient has given written, informed consent to administration of the neuroleptic medication.

(c) A neuroleptic medication may be administered to a patient who is not competent to consent to neuroleptic medications if the patient, when competent, prepared a declaration under subdivision 6d requesting the treatment or authorizing a proxy to request the treatment or if a court approves the administration of the neuroleptic medication.

(d) A neuroleptic medication may be administered without court review to a patient who has not prepared a declaration under subdivision 6d and who is not competent to consent to neuroleptic medication if:

(1) the patient does not object to or refuse the medication;

(2) a guardian ad litem appointed by the court with authority to consent to neuroleptic medications gives written, informed consent to the administration of the neuroleptic medication; and

(3) a multidisciplinary treatment review panel composed of persons who are not engaged in providing direct care to the patient gives written approval to administration of the neuroleptic medication.

\* \* \* \* \* \*

Minn.Stat. § 253B.03, subds. 6a–6c (1992). The statutory scheme outlined above creates a series of procedural protections for mentally ill patients in subdivision 6c. These patients may be administered neuroleptics only if: (1) a competent patient consents; or (2) an incompetent patient prepared a prior, written consent when competent; or (3) a court approves the treatment; or (4) without court order if a patient (a) does not object or refuse treatment, (b) a guardian ad litem appointed by the court gives written, informed consent, and (c) a multidisciplinary treatment review panel, composed of persons who are not involved in giving direct care to the patient, gives written approval; or (5) in an emergency situation, and only for as long as the emergency exists. In contrast, subdivision 6a provides only one requirement for mentally retarded persons: that the patient, or the patient's guardian, must consent before psychotropic drugs may be administered.[1]

Although *Price, Jarvis,* and *Schmidt* all addressed the procedures to which mentally ill patients are entitled, this court has not explicitly answered this question with respect to mentally retarded patients. The state asserts that the statutory scheme indicates that the legislature intended to impose separate procedures for mentally retarded and mentally ill patients and that, therefore, consent by a public guardian is sufficient for mentally retarded patients.

This position, however, is contradicted by this court's observation that the imposition of procedural protections was not based on

---

**1.** As defined by the Minnesota Department of Human Services Guidelines for the Use of Psychotropic Medication for Individuals with Developmental Disability, dated October 1988, "psychotropic" medication includes various neuroleptic drugs. "Neuroleptic" medications are also commonly referred to as "major tranquilizers" or "antipsychotics."

the commitment statutes but rather "on our belief that the right to prior judicial review is necessary to protect the patient's rights under the Minnesota constitution." *In re Chonis,* 478 N.W.2d 199, 200 (Minn. 1991) (*citing Jarvis,* 418 N.W.2d at 147–49). One of the overarching principles behind these procedures was the belief that those consenting to the administration of neuroleptic medications should not include those responsible for the patient's commitment. *Schmidt,* 443 N.W.2d at 827; *Price,* 307 Minn. at 262 n. 11, 239 N.W.2d at 913 n. 11.

In addition, establishing totally separate procedures based on the categorization of a patient as mentally ill or mentally retarded is unwarranted, especially in cases such as this where the state admits that Blilie suffers from mental illness as well as mental retardation. Creating separate procedures could lead to endless litigation on the issue of whether a patient should be categorized as mentally ill or mentally retarded. The only way to harmonize this statutory scheme is to give mentally retarded and mentally ill patients the same procedural protections.

Thus, we hold that mentally retarded patients must be afforded the same procedural protections as those outlined in *Price, Jarvis,* and *Schmidt* for mentally ill patients but that a public guardian may be substituted for a court-appointed guardian ad litem in making such treatment decisions. One of the primary reasons behind requiring a court-appointed guardian ad litem for mentally ill patients is that most of them lack permanent guardians to protect their best interests, whereas nearly all mentally retarded patients have permanent guardians to act on their behalf. The public guardian, who has a wide range of duties with respect to the patient, *see* Minn. Stat. §§ 252A.111, 525.56, subds. 1–3 (1992), has much broader knowledge of the patient's concerns and needs than would a guardian ad litem who is appointed for the

limited purpose of evaluating the appropriateness of neuroleptic medication. The predominance of the use of long-term guardians for mentally retarded persons makes unnecessary the appointment of a temporary guardian ad litem to make treatment decisions for such patients.

While we are not unmindful of appellant's concern that a patient's right to privacy might conceivably be violated if the treatment decision rested solely upon the unfettered discretion of the commissioner or the commissioner's surrogates, such principles are not violated where, as here, approval is required by an interdisciplinary treatment review panel before treatment may be implemented.[2] *See Schmidt,* 443 N.W.2d at 827; *Price,* 307 Minn. at 262 & n. 11, 239 N.W.2d at 913 & n. 11. As a final check on the potential for unilateral or collusive decision making, the patient, guardian, and medical director all retain the statutory right to challenge the decision to administer neuroleptics. *See* Minn. Stat. § 252A.19, subd. 2 (1992); Minn.Stat. § 253B.03, subd. 6c(h) (1992).

We reiterate today the continuing validity of the *Price* procedures and hold that they must be applied equally to mentally retarded and mentally ill patients who face intrusive treatment procedures. *See Jarvis,* 418 N.W.2d at 147. The primary concern we raised in *Price,* 307 Minn. at 262, 239 N.W.2d at 913, *Jarvis,* 418 N.W.2d at 148, and *Schmidt,* 443 N.W.2d at 828, that intrusive therapy should not be authorized by persons engaged in providing direct care to a patient, has been addressed by the requirement that neuroleptics may not be administered without the consent of a permanent guardian or guardian ad litem and a multidisciplinary treatment review panel. These procedural requirements comport with the purposes underlying these cases, and they adequately protect appellant's pri-

---

**2.** The procedural steps required in this case included interdisciplinary team assessment and approval (a team which consists of the county case manager, the patient and/or a legally authorized representative, and all service providers), behavior management review committee approval, and medical director approval, as well as the consent of the patient or guardian. Ongoing monitoring is conducted, and the patient's family is fully apprised of the patient's progress under the treatment method.

vacy rights. Thus, we reject appellant's constitutional challenge.

Affirmed.

PAGE, J. took no part in the consideration or decision of this case.