STATE of Minnesota, Respondent,

v.

Wesley BROOKS, petitioner, Appellant.

No. C1–98–2388.

Supreme Court of Minnesota.

Jan. 13, 2000.

As Modified March 15, 2000.

Samuel A. McCloud, Kelly Vince Griffitts, Shakopee, for appellant.

Michael A. Hatch, Minnesota Attorney General, St. Paul, Thomas J. Harbinson, Scott County Attorney, Michael J. Groh, Assistant Scott County Attorney, Shakopee, for respondent.

John M. Stuart, Minnesota State Public Defender, Marie L. Wolf, Asssistant State Public Defender, Minneapolis, for amicus curiae State Public Defender.

Gina G. Washburn, Executive Director, MN County Attorneys Association, Robert A. Stanich, Assistant Attorney General, St. Paul, for amicus curiae MN County Attorneys Association.

## OPINION

PAUL H. ANDERSON, Justice.

The overriding issue in this case is whether the Minnesota Constitution prohibits monetary bail that can be satisfied only by a cash deposit of the full amount set by the court. Article I, Section 7 of the Minnesota Constitution provides that "[a]ll persons before conviction shall be bailable by sufficient sureties * * * ." Appellant, Wesley Eugene Brooks, asserts that a Scott County District Court order setting "cash only bail" violates this provision of Minnesota's Constitution. On appeal, the Minnesota Court of Appeals held "cash only" bail constitutional. Because we conclude that cash only bail violates Minnesota's Constitution, we reverse.[1]

The facts in this case are not in dispute. On August 27, 1998, Brooks, a resident of Prior Lake, Minnesota, began a one-year sentence to be served by electronic home monitoring. One condition of Brooks' home monitoring was that he abstain from using any controlled substance. Because a urinalysis taken as Brooks was about to begin his sentence tested positive for cocaine, he was asked to take a second test on September 8, 1998. This test was also positive, indicating that Brooks had been using a controlled substance while on home monitoring. Because Brooks failed the second test, a police officer telephoned Brooks at his residence and spoke with him at approximately 8:30 a.m. on September 11, 1998. The officer informed Brooks that he was at Brooks' residence to return him to jail. Brooks told the officer that he would "be right up," but while the officer waited, Brooks fled.

On September 22, 1998, Scott County authorities charged Brooks with escape from custody under Minn.Stat. § 609.485, subd. 2(1), 4(1) (1998). Brooks was subsequently apprehended in Florida. On November 26, 1998, Scott County authorities traveled to Tampa, Florida, took Brooks into custody from Florida authorities, and

---

1. The term "cash only bail" as used in this opinion refers to the practice of setting a monetary bail amount that can be satisfied only by a cash deposit of the full amount set by the court. It does not include, and we do not address, the practice by which some courts, as a condition of release, permit an accused to make a cash deposit with the court in an amount less than the full amount of bail set by the court.

returned him to Minnesota. Four days later, on November 30, Brooks appeared for his bail hearing. At the hearing, the state specifically requested "cash bail," stating that Brooks represented a flight risk. The judge set bail at $6,000, the statutory maximum for a gross misdemeanor, and further ordered that it be cash only. *See* Minn.Stat. § 629.471, subd. 1 (1998). At his next appearance on December 7, 1998, before the same judge, Brooks moved for bail reduction or to be allowed to post bond. The court denied the motion.

Two days later, on December 9, Brooks appeared for an omnibus/pretrial hearing before a different judge. At this hearing, Brooks again asked the court to reconsider the cash only bail order and moved the court to be allowed to post a bond, arguing that cash only bail is unconstitutional. The state argued that bail should remain cash only because Brooks: (1) represented a high flight risk, (2) had already served a one-year sentence from which he had absconded, and (3) was receiving a substantial income. The second judge denied the motion to allow Brooks to post bond, saying that the matter was already decided and that he would not act as a court of appeals to "reverse the decision made by a member of the bench sitting at the same level."

Brooks filed a notice of appeal with the court of appeals arguing that cash only bail is unconstitutional. Both Brooks and the state submitted informal briefs to the court. Although the only transcript ordered and relied on by Brooks was from the December 9 hearing before the second judge, the state's brief contained references to the two hearings before the first judge. Brooks moved to strike from the state's brief those facts not contained in the district court record submitted to the court on appeal. The court of appeals then granted Brooks' motion before receiving the state's response although the period in which a timely response could have been received had not elapsed. *See generally,* Minn.R.Civ.App.P. 125.01, 125.03, 126.01, 127. In its response, the state argued that if the motion to strike was granted, then the court of appeals did not have jurisdiction to consider the appeal. More particularly, the state argued that because the order being appealed was issued by the first judge and because the second judge refused to reconsider that order, the appeal was not perfected unless it included the first judge's order setting cash only bail and that judge's subsequent order declining to reconsider bail.

The court of appeals in an unpublished opinion held that "cash only" bail does not violate the Minnesota Constitution. *See State v. Brooks,* 1999 WL 153793, at *2 (Minn.App. March 23, 1999). While the court recognized that cash only bail deprives a defendant of commercial bond services, it held that the phrase "sufficient sureties" does not create a constitutional right to post bond. *See id.* The court reasoned that "[t]he form of the security, as much as its sufficiency, is for the protection of the court and is not a matter of constitutional right to the defendant." *Id.* On appeal to our court, Brooks asserts that the court of appeals erred and again argues that cash only bail violates Article I, Section 7 of the Minnesota Constitution.

I.

We must first decide whether the issue presented in this case is moot. Courts will only decide actual controversies; therefore, appellate courts will dismiss an appeal as moot if an event occurs that renders the grant of effective relief impossible. *See State ex rel. Lezer v. Tahash,* 268 Minn. 571, 571, 128 N.W.2d 708, 708 (1964). An exception to this rule exists when an issue is capable of repetition, yet will evade judicial review. *See In re Schmidt,* 443 N.W.2d 824, 826 (Minn.1989). While this exception to the mootness doctrine is flexible, we have stated that in order for us to decide an issue, it must be "functionally justiciable." *See State v. Rud,* 359 N.W.2d 573, 576 (Minn.1984). "A case is functionally justiciable if the

record contains raw material * * * traditionally associated with effective judicial decision-making." *Id.* Appellate courts also consider whether the issues presented are "important public issues of statewide significance that should be decided immediately." *Id.*

At oral argument, Brooks' attorney informed the court that Brooks posted the $6,000 bail in cash and is no longer in custody. Although Brooks' appeal to this court may, as a consequence, be moot, we reach the merits of his case because cash only bail orders are capable of repetition, likely to evade judicial review, and an issue of statewide significance. Less than a year ago, in *State v. Arens*, we were presented with a cash only bail issue which originated in Lyon County. 586 N.W.2d 131 (Minn.1998). That this issue has reached this court twice in one year from two different jurisdictions indicates that the issue is both significant and capable of repetition. Additionally, cash only bail is an important public issue of statewide significance upon which this court should rule. Most pretrial bail issues are, by definition, short-lived and failure to decide this issue could have a continuing adverse impact on those defendants who are unable to post cash only bail. Indeed, failure to address this issue may create a class of defendants with constitutional claims but no remedy. Finally, as this case is presented to us, it is functionally justiciable because the record contains the raw material necessary for effective judicial decision-making.

## II.

Having concluded that cash only bail orders are within the exception to the mootness doctrine, we must now consider whether such orders are prohibited in Minnesota. Minnesota's Constitution addresses bail in two different clauses. Article I, section 5 provides that "excessive bail shall not be required" and article I, section 7 guarantees that "[a]ll persons before conviction shall be bailable by suffi-

cient sureties * * *." Minn. Const. art. I, §§ 5, 7. Both Brooks and the state base their arguments regarding the permissibility of cash only bail on their interpretation of the bail clause contained in Article I, Section 7 of the Minnesota Constitution.

The Bail Clause of article I, section 7 provides that "[a]ll persons before conviction shall be bailable by sufficient sureties, except for capital offenses when the proof is evident or the presumption great." Resolution of the cash only bail issue turns on interpretation of this clause, and more particularly on the phrase "sufficient sureties." Issues of constitutional interpretation are questions of law and are reviewed by this court de novo. *See In re Blilie*, 494 N.W.2d 877, 881 (Minn.1993). When constitutional language is unambiguous, the language is effective as written and no further rules of construction should be applied. *See Kernan v. Holm*, 227 Minn. 89, 92, 34 N.W.2d 327, 329 (1948). If the language is ambiguous, the court must look beyond the words for other indicia of intent. *See Wynkoop v. Carpenter*, 574 N.W.2d 422, 425 (Minn.1998).

Both Brooks and the state argue that the language at issue is unambiguous. Brooks, relying on the plain meaning of the word "surety," argues that the phrase "sufficient sureties" demonstrates the intent that defendants be allowed to post a bond as an alternative to cash. In contrast, the state focuses on the word "sufficient" and asserts that the phrase "sufficient sureties" is intended to preserve a district court's broad discretion. The state argues that, in adopting the constitution, the framers meant that " 'sufficient' indicates that the [district] court [is] to determine what was sufficient under the circumstances." The state then asserts that use of the plural word "sureties" instead of bail, bond, or cash demonstrates "that more than one method of bail was available" and that the court has the discretion to determine which method is used.

*History of Bail*

The United States Supreme Court has stated that the purpose of bail is to ensure an accused's appearance and submission to the court's judgment. *See Reynolds v. United States,* — U.S. ——, 80 S.Ct. 30, 32, 4 L.Ed.2d 46 (1959).[2] We also have articulated that this is a purpose of bail in Minnesota. *See State v. Mastrian,* 266 Minn. 58, 59, 122 N.W.2d 621, 622 (1963) (holding that "[t]he purpose of arrest and confinement of [an accused] is to assure his presence at * * * trial * * * [while] [t]he purpose of bail * * * is to permit his release if appearance at trial can otherwise be guaranteed"). However, while both the United States Constitution and the Minnesota Constitution protect a defendant from excessive bail, the protections of the Minnesota Constitution are broader because of article I, section 7. This difference is critical to our analysis and to fully understand this critical difference, some knowledge of the history of bail is necessary. Therefore, it is important to examine the origin of bail and its development in Anglo–American jurisprudence. In this historical analysis, particular attention needs to be given to the derivation and interpretation of the phrase "sufficient sureties."

Bail was an Anglo–Saxon invention designed to complement a monetary fine or "bot" system, which was intended to guarantee both the appearance of an accused and payment of the "bot" upon conviction. *See* June Carbone, *Seeing Through the Emperor's New Clothes: Rediscovery of Basic Principles in the Administration of Bail,* 34 Syracuse L.Rev. 517, 519–20 (1983). Bail developed when most of the punishments applicable to freemen were money fines. *See id.* at 520.

The concept of bail surety evolved out of necessity when a shortage of traveling magistrates resulted in accused persons being jailed for lengthy periods before trial. *See* Daniel J. Freed & Patricia M. Wald, *Bail in the United States* 1–3 (1964); Wayne H. Thomas, Jr., *Bail Reform in America* 11 (1976). The bail system and its reliance on personal surety emerged to prevent excessive pretrial detention. Personal surety referred to a reputable friend, relative, or neighbor into whose custody the accused would be released. *See* Thomas, *supra,* at 11. This system allowed the accused to be released into the custody of the personal surety who would then be responsible for the accused's appearance at trial. *See id.* The bail amount was normally equal to the monetary penalty, so if the accused fled, he was presumed guilty and the personal surety became responsible for the monetary penalty. *See* Carbone, *supra,* at 520. Because the personal surety was responsible for payment of the penalty, the surety had a strong incentive to make sure the accused appeared. *See id.*

The Anglo–Saxon bail system changed when corporal punishment replaced the "bot" system for most criminal offenses. *See id.* at 521. Bail availability was increasingly restricted, in part because corporal punishment afforded an accused greater incentive to flee. *See id.* at 521–22. A resulting lack of uniformity in bail administration prompted the Statute of Westminster in 1275. *See id.* at 523. This statute defined who was bailable, but the statute's categories were confusing and complicated. *See id.* at 526, 529. Never-

---

**2.** *See also Stack v. Boyle,* 342 U.S. 1, 72 S.Ct. 1, 96 L.Ed. 3, (1951) where the United States Supreme Court held that

[t]he right to release before trial is conditioned upon the accused's giving adequate assurance that he will stand trial and submit to sentence if found guilty. Like the ancient practice of securing the oaths of responsible persons to stand as sureties for the accused, the modern practice of requir-

ing a bail bond or the deposit of a sum of money subject to forfeiture serves as additional assurance of the presence of the accused. Bail set at a figure higher than an amount reasonably calculated to fulfill this purpose is "excessive" under the Eighth Amendment.

342 U.S. 1, 4–5 (1951) (internal citations omitted).

theless, the statute was to govern English bail law for the next five centuries. *See id.* at 523.

Although the American colonies initially accepted many aspects of the English bail system, some eventually shied away from the Statute of Westminster's confusing categorization of who was bailable. *See* Carbone, *supra,* at 529. Instead, these colonies redefined the right to bail. *See id.* Pennsylvania, for example, adopted the Great Law of 1682, which provided that "all Prisoners shall be Bailable by *Sufficient Sureties,* unless for capital Offenses, where the proof is evident or presumption great." *Id.* at 531 (emphasis added). This language, which was ultimately incorporated into the Pennsylvania Constitution, became the model for almost every state constitution adopted after 1776. *See* Carbone, *supra,* at 532; Penn. Const. art. I, § 14. Consequently, approximately two-thirds of state constitutions, including Minnesota's, contain similar or identical language. *See generally* Carbone, *supra* at 532. Given the historical significance of Pennsylvania's bail provision, further exploration of its origin is warranted.

The Quakers, who founded Pennsylvania, had an aversion to the inefficient bail system that had evolved under the Statute of Westminster. *See* Paul Lermack, *The Law of Recognizances in Colonial Pennsylvania,* 50 Temp. L.Q. 475, 477 (1977). They had their own reasons for wanting to limit the scope and power of judicial institutions. *See id.* Having been persecuted in England, they had greater sympathy for detained defendants than for a powerful judiciary. *See id.* Indeed, the state's founder, William Penn, had been arrested in England for unlawful preaching and was jailed for a significant period of time. *See id.* Other Quakers remembered being jailed for contempt for offenses such as refusing to remove their hats. *See id.* The Quakers were also among the first to emphasize rehabilitation instead of punishment in their laws. *See id.* at 478; *see also* Carbone, *supra,* at 531 n. 68. As a result, Pennsylvania adopted its constitutional provision making almost all offenses bailable. *See* Carbone, *supra,* at 531.

Because our bail system, with some modification, is largely patterned after the English system, American courts—at least until the nineteenth century—utilized the personal surety system. But, as modern society evolved, it became increasingly difficult to find reliable persons known by both the courts and the accused. *See* Thomas, *supra,* at 12. As a result, the personal surety system evolved into the commercial bondsman system that exists today. *See id.*

As previously noted, the general purpose of bail is to ensure an accused's appearance and submission to the judgment of the court. However, when viewed in its historical context, it becomes clear that the section 7 Bail Clause has a broader purpose. In essence, the clause limits government power to detain an accused prior to trial. The clause is intended to protect the accused rather than the courts. It is this broader purpose that distinguishes the rights granted under Article I, Section 7 of the Minnesota Constitution from the bail rights granted under the Eighth Amendment of the United States Constitution.

*De-emphasizing Monetary Bail – The Bail Reform Act of 1966 and Minnesota Rule of Criminal Procedure 6.02*

An important recent development in our bail system was the Bail Reform Act of 1966. The United States Congress, noting the emphasis on monetary bail and recognizing the resulting adverse impact on the poor, passed the Bail Reform Act in 1966 to de-emphasize the use of monetary bail and to encourage judges to consider non-monetary release conditions. *See* 18 U.S.C. § 3142 (1998); *see also* 2 Charles E. Torcia, *Wharton's Criminal Procedure,* § 302 (13th ed.1990). The Act provides that, when possible, pretrial release should be ordered on personal recognizance. *See* 18 U.S.C. § 3142. If release on personal recognizance is deemed ineffective for assuring a defendant's appearance or is inim-

ical to public safety, then the judge is to impose additional conditions. *See id.* The critical thrust of the Act is to de-emphasize monetary bail. This Act became the model for Minn. R.Crim. P. 6.02. *See* Torcia, *supra* at § 302.

Rule 6.02 adopts nonmonetary conditions like those enumerated in the Act and establishes a preference for pretrial release with no monetary conditions. *See* 8 Henry W. McCarr, *Minnesota Practice–Criminal Law and Procedure*, § 15.5 (2d ed.1990); Minn. R.Crim. P. 6.02, subd. 1. However, the imposition of additional conditions is allowed if such release will be "inimical of public safety or will not reasonably assure the appearance of the person as required." Minn. R.Crim. P. 6.02, subd. 1. Four possible additional conditions are listed, with judges being instructed to "impose the first of the following conditions of release which will reasonably assure the appearance of the person for trial or hearing." *Id.* If no single condition is deemed appropriate, the rule allows for the use of any combination of the conditions, which are as follows:

(a) Place the person in the care and supervision of a designated person or organization agreeing to supervise the person;

(b) Place restrictions on the travel, association or place of abode during the period of release;

(c) Require the execution of an appearance bond in an amount set by the court with sufficient solvent sureties, or the deposit of cash or other sufficient security in lieu thereof; or

(d) Impose any other condition deemed reasonably necessary to assure appearance as required, including a condition requiring that the person return to custody after specified hours.

*Id.* By echoing those conditions enumerated in the Bail Reform Act, Rule 6.02 reiterates the intent to de-emphasize monetary bail.

*Minnesota Caselaw*

There is only one case in which our court has directly addressed the Bail Clause in article I, section 7. *See State v. Pett,* 253 Minn. 429, 92 N.W.2d 205 (1958). In *Pett,* we faced the issue of whether bail could be denied under article I, section 7 following the abolishment of capital punishment. *See id.* at 430, 92 N.W.2d at 206. In interpreting this bail clause, we placed great importance on the fact that Minnesota had modeled this part of its constitution after language in the Pennsylvania Constitution. *See id.* at 431–32, 92 N.W.2d at 207; *see also* Penn. Const. art. I, § 14. Further, we stated:

> When the Minnesota constitution was drafted, the provisions of the constitutions of states admitted prior to Minnesota were available, and we must assume that they were carefully studied and compared. * * * It must be assumed that the provision we adopted was carefully selected from among the various provisions dealing with the subject. of bail found in the constitutions of states already admitted to the Union.

*Pett,* 253 Minn. at 432, 92 N.W.2d at 207.

The Pennsylvania Supreme Court has held that the right to bail before trial is specifically guaranteed by the Pennsylvania Constitution. *See Commonwealth v. Caye,* 447 Pa. 213, 290 A.2d 244, 245 (1972); *see also Commonwealth v. Lemley,* 2 Pitts. 362, 363 (1862). Likewise, in *Pett* we held that, following the abolishment of capital punishment in Minnesota, all crimes are bailable. *See Pett,* 253 Minn. at 433, 92 N.W.2d at 208. In applying this rule to the facts before us in *Pett,* we concluded "that under our constitution the [district] court had no discretion except in fixing the amount of bail."[3] *Id.* at 435, 92

---

**3.** Although this statement may appear to sharply curtail a district court's discretion in setting bail conditions, we do not interpret it so strictly. We believe that it was meant to be an application of the *Pett* holding to the district court's actions in that case. It was not intended to be a broad limitation on a district court's discretion.

N.W.2d at 209. The *Pett* holding is critical to our analysis because it establishes that all crimes in Minnesota are bailable. It also establishes that the history of the Pennsylvania bail clause is useful when interpreting our Bail Clause in section 7, which in turn supports the conclusion that Minnesota's Bail Clause limits government power and protects the accused.[4]

*Foreign Jurisdictions*

Given that there is no Minnesota authority directly addressing the validity of cash only bail orders, it is appropriate to examine how other states with identical or similar constitutional provisions have addressed this issue. Although more than two-thirds of state constitutions contain provisions identical or similar to Minnesota's, appellate courts in only three states, Ohio, Louisiana, and Tennessee, have dealt with this issue.[5] The Ohio Supreme Court relied on the plain meaning of its constitution as well as a criminal rule similar to Minnesota's Rule 6.02 to hold cash only bail unconstitutional. *See State ex rel. Jones v. Hendon*, 66 Ohio St.3d 115, 609 N.E.2d 541, 543–44 (1993). The Louisiana Court of Appeals relied on the plain meaning of the word "surety" as derived from state statutes to reach the same result. *See State v. Golden*, 546 So.2d 501, 503 (La.Ct.App.1989), *writ. denied*, 547 So.2d 365 (La.1989). In contrast, the Tennessee Court of Appeals held cash only bail impermissible based on statutory interpretation, but addressed the constitutionality of cash only bail in dicta. *See Lewis Bail Bond Co. v. General Sessions Court of Madison County*, No. C–97–62, 1997 WL

711137 at *3 (Tenn.Ct.App. Nov.12, 1997) (unpublished decision).[6]

Examination of how these other courts have addressed the issue of cash only bail does not provide definitive guidance for resolving the case before us, but the cases are helpful in some respects. While the three states reached their holdings by different routes, they all held cash only bail impermissible. It is also important to note that the courts in Ohio and Tennessee stated that the apparent reason for cash only bail orders was, in effect, to deny bail in violation of their state constitutions.

*Minnesota's Constitution Prohibits Cash Only Bail*

■ Our next step is to determine whether the phrase "sufficient sureties" as used in Minnesota's Constitution is ambiguous and whether it prohibits cash only bail. We conclude that this phrase is unambiguous and that it prohibits cash only bail. We base our conclusion on the plain meaning of the word "surety." Our conclusion is supported by the definition of surety, its historical usage, our decision in *Pett*, and the holdings of other courts.

Dictionary definitions demonstrate both historic and contemporary consistency in the meaning of the word "surety." The *Oxford English Dictionary* defines "surety" as "[a] formal engagement entered into, a pledge, bond, guarantee, or security given for the fulfillment of an undertaking." 2 *The Compact Edition of the Oxford English Dictionary* 285 (1987). At the time the Minnesota Constitution was drafted, "surety" was defined as:

**4.** The dissent ignores the significance of our decision in *Pett*. In *Pett*, we placed great importance on the Minnesota constitutional framers' choice to model the section 7 Bail Clause after a similar provision in the Pennsylvania Constitution. *See Pett*, 253 Minn. at 431, 92 N.W.2d at 207. Accordingly, in order to determine the purpose of the section 7 Bail Clause, it is important to understand the origin of Pennsylvania's bail clause.

**5.** Although the Delaware Supreme Court has affirmed a cash only bail order on appeal in *Miller v. State*, the court did not address the validity of cash only bail. 1994 WL 679746 (Del. Nov.30, 1994) (unpublished opinion).

**6.** As in the case before this court, the *Lewis* court faced the issue of mootness, but held that the issue evaded the mootness doctrine because it involved cases that arise frequently and are likely to evade review. *See Lewis*, 1997 WL 711137 at *3.

One who is bound for another who is primarily liable and is called the principal. One who engages to be answerable for the debt, default, or miscarriage of another; one who undertakes to do some act in the event of the failure of another to do it, and as security for it being done.

2 Alexander M. Burrill, *New Law Dictionary and Glossary*, 959 (N.Y.1850). The modern definition is not substantially different. *Black's Law Dictionary* defines the word both as "[a] person who is primarily liable * * * for the performance of another's obligation" and as "[a] formal assurance; esp., a pledge, bond, guarantee, or security given for the fulfillment of an undertaking." *Black's Law Dictionary* 1455–56 (7th ed.1999). These definitions of "surety" denote a third person assuming the responsibility of another and the assurance for something being done. Surety can encompass a broad array of undertakings, often by a third person, that provide adequate assurance for the performance of an obligation.

It is here that we agree with the state and amicus, Minnesota County Attorney's Association, that surety has a broad meaning, but we disagree with their argument that this broad meaning gives the district court the discretion to limit the form of acceptable surety to cash only bail. As we have previously concluded, surety as used in Minnesota's section 7 Bail Clause is for the protection of the accused rather than the court. We further conclude that surety encompasses a broad array of options and forms of security to satisfy the monetary bail amount deemed necessary by the court to assure appearance. Therefore, it is improper to interpret the section 7 Bail Clause as allowing the court to limit an accused to cash only bail.

■ Construing surety broadly is consistent with its historical usage. The concept of surety, from its inception in early England to its use in the modern bail system, has involved the concept of a third party assuming responsibility for an ac-

cused's appearance. Accordingly, the guarantee of "sufficient sureties" must, at the very least, protect an accused's access to helpful third parties. But the better definition of surety in the context of the section 7 Bail Clause is more expansive. It encompasses a broad array of methods to provide adequate assurance that an accused will appear as the court requires. Applying a narrower definition would create a rule vulnerable to abuse. If judges have unlimited discretion to specify the form of acceptable bail, they would, for example, be able to set bail payable only by real property. If the accused in such a case does not own any real property, he is in essence being denied bail when he may be able to provide adequate assurance by some other means. As a result, the accused's constitutional right is violated. Similarly, cash only bail orders can be used to deny bail to those accused who have other means of providing sufficient surety. This reasoning is consistent with that used by other appellate courts which have held cash only bail orders impermissible.

Our conclusion about the meaning of the phrase "sufficient sureties" is also supported by our holding in *Pett* and our reliance on that phrase's roots in Pennsylvania law. In construing the section 7 Bail Clause, we held that our constitution guarantees broader protection than the Eighth Amendment of the United States Constitution by providing that all crimes are bailable. In reaching this conclusion in *Pett*, we relied on the history of Pennsylvania's bail clause which evinces a clear intent to limit government power and to protect an accused's right to bail prior to trial.

Finally, to the extent that we conclude that the section 7 Bail Clause prohibits the court from setting a monetary bail amount that can be satisfied only by a cash deposit in the full amount of bail set by the court, our conclusion is consistent with the purpose of Rule 6.02. Rule 6.02 de-emphasizes monetary bail and encourages release on the least restrictive conditions. We

emphasize, however, that this case addresses only the issue of the constitutionality of cash only bail and does not involve release conditions.

 For the foregoing reasons, we hold that Article I, Section 7 of the Minnesota Constitution prohibits a court from setting a monetary bail amount that can be satisfied only by a cash deposit in the full amount of bail set by the court. Therefore, Brooks' rights under our constitution were violated because his bail order limited him to posting cash bail for the full amount of bail set by the court, thereby restricting his right to post bail by providing alternative forms of sufficient surety. We reverse the decision of the court of appeals and remand this matter to the district court for any further proceedings necessary for the actions of that court to be consistent with this opinion.

Reversed and remanded.

STRINGER, Justice (dissenting).

I respectfully dissent. Although I agree with the majority's determination that this matter is not moot because it is capable of repetition yet evades review, I disagree with the conclusion that cash only bail violates the Minn. Const. art. I § 7. The constitution does not prohibit the imposition of cash only bail and the ruling of the majority significantly limits the discretion of Minnesota district courts as to appropriate bail.

The majority's reasoning seems to flow from what I believe to be two faulty assumptions. First is the claim that the sole purpose of bail under Minn. Const. art. I § 7 is to protect the defendant from the court's power to detain before trial. In reaching this conclusion the majority looks to the Pennsylvania Quakers who, after experiencing persecution by English courts, drafted the Pennsylvania state constitution to limit the scope of judicial power. Whatever the concerns of the Quak-

ers, the U.S. Supreme Court as well as this court have long ago and often stated that the primary purpose of bail is to ensure the defendant's appearance and submission to the judgment of the court. *See Ex Parte Milburn,* 34 U.S. (9 Pet.) 704, 710, 9 L.Ed. 280 (1835) ("A recognizance of bail, in a criminal case, is taken to secure the due attendance of the party accused"); *Reynolds v. United States,* —— U.S. ——, 80 S.Ct. 30, 32, 4 L.Ed.2d 46 (1959) ("The purpose of bail is to insure the defendant's appearance and submission to the judgment of the court"); *State v. Mastrian,* 266 Minn. 58, 59, 122 N.W.2d 621, 622 (1963) ("The purpose of bail * * * is to permit [defendant's] release if appearance at trial can otherwise be guaranteed.").

Bail reconciles the defendant's submission to the court with his liberty interest. *See Bandy v. United States,* —— U.S. ——, 81 S.Ct. 197, 5 L.Ed.2d 218 (1960) (bail is the device that reconciles the "right to freedom during trial and pending judicial review * * * with the possibility that the defendant may flee or hide himself"); *In re Shetsky,* 239 Minn. 463, 471, 60 N.W.2d 40, 46 (1953) (The purpose of bail is "to relieve the accused of imprisonment and the state of the burden of detaining him pending the trial and at the same time * * * to insure his presence for trial at the call of the court without in any way delaying, impairing, or unduly burdening the administration of justice."). "Bail acts as a reconciling mechanism to accommodate both the defendant's interests in pretrial liberty and society's interest in assuring the defendant's presence at trial." Donald B. Verrilli, Jr., Note, *The Eighth Amendment and the Right to Bail: Historical Perspectives,* 82 Colum. L.Rev. 328, 329–30 (1982). In its interpretation of Minn. Const. art. I § 7 the majority has recast this "reconciling mechanism" into the notion that bail is "intended to protect the accused rather than the courts." Under

this construal, the cushion that bail historically provided between a defendant's liberty and a court's power to detain has now become a shield for a defendant's protection against the power of courts. Not only does this misconstrue our previous rulings on bail–it ignores its fundamental purpose of assuring the appearance of a defendant in court.

The majority asserts in footnote four that I do not place enough importance on Pennsylvania's constitutional history in interpreting the purpose of our constitution's bail clause. It is notable that Pennsylvania law, on which the majority places such reliance, has never ruled that cash only bail violates its constitution. With no ruling on the issue in Pennsylvania, the majority's conclusion that cash only bail is prohibited in Minnesota seems an unwarranted leap of logic.

Second, the majority's analysis of the "sufficient sureties" language in the constitution overlooks a common usage of "surety" as well as the meaning of "sufficient." The majority argues that both definitions of "surety," including "[a] formal assurance; esp., a pledge, bond, guarantee, or security given for the fulfillment of an undertaking," *Black's Law Dictionary* 1456 (7th ed.1999), connote a third person assuming responsibility for another's obligation. "Surety," in this sense however, must refer to the form of guarantee the court may impose to assure the appearance of the defendant, whatever that form may be, as that is the interest the U.S. Supreme Court and this court have repeatedly held to be at stake. *See Reynolds*, —— U.S. ——, 80 S.Ct. at 32; *Mastrian*, 266 Minn. at 59, 122 N.W.2d at 622. There is thus no constitutional mandate, policy interest or logical construction served by construing "sufficient sureties" to mean defendant's access to third parties. Moreover, "sufficient" is defined as "[a]dequate; of such quality, number, force, or value as is necessary for a given purpose." *Black's Law Dictionary* at 1447. The term "sufficient sureties" certainly does not prohibit cash only bail. More logically, it requires that the court, before releasing a defendant, must set bail to assure that the defendant will reappear in the courtroom, and provides the trial court with discretion to achieve that result.

Appellant fled to Florida to escape going to jail for a gross misdemeanor and the district court could not be reasonably assured of his next appearance in court. I would affirm the decision of the court of appeals holding the cash only bail imposed by the trial court does not violate the constitution and was within the discretion of the trial court.