Stephen GASKIN, Plaintiff-Appellee,

v.

David A. COLLINS, State Coordinator of Elections; Mae Weeks, Lewis County Registrar of Voters; and William M. Leech, Jr., Attorney General of the State of Tennessee, Defendants-Appellants.

Supreme Court of Tennessee.

Dec. 12, 1983.

Albert Bates, Summertown, for plaintiff-appellee.

William P. Sizer, Asst. Atty. Gen., Nashville, for defendants-appellants; William M. Leech, Jr., Atty. Gen. & Reporter, Nashville, of counsel.

## OPINION

DROWOTA, Justice.

The primary issue before us on appeal is whether the retroactive application of certain amendments in 1981 to the Election Code, which amendments disenfranchised convicted felons, violates the state constitution. More specifically, we are asked to determine whether T.C.A. §§ 2–2–139(d) and 2–19–143(4) violate Article I, § 5 of the Tennessee Constitution.

The Appellee, Stephen Gaskin, was convicted on November 11, 1971, of the felony of "manufacturing marijuana." At that time, it was not an infamous crime. In 1975, Appellee Gaskin completed his term of incarceration and returned to society with all of his former rights, privileges and immunities restored. On May 18, 1981, two bills became law which had the effect of expanding the definition of infamous crimes to include all felonies, and disenfranchising all felons regardless of when they were convicted. Chapter 342 of the Public Acts of 1981 amended what was then T.C.A. § 40–2712 and redefined infamous crime to include all felony offenses. That provision is now found at T.C.A. § 40–20–112. Chapter 345 of the Public Acts of 1981 amended the election code to provide that the right of suffrage shall be denied those persons convicted of infamous crimes as defined in T.C.A. § 40–20–112. The relevant portion of Chapter 345, specifically Section 8 thereof, now codified in T.C.A. §§ 2–2–139(d) and 2–19–143(4), is as follows:

The provisions of this section, relative to the forfeiture and restoration of the right of suffrage for those persons convicted of infamous crimes, shall also apply to those persons convicted of crimes prior to May 18, 1981, which are infamous crimes after May 18, 1981.

On September 21, 1982, Appellee Gaskin was informed by Appellant Mae Weeks, Lewis County Registrar of voters, that his voter registration was revoked. This action was taken pursuant to instructions from Appellant, David Collins, State Co-ordinator of Elections, advising all county registrars-at-large to revoke registration and purge the voter rolls of names of any person known to have committed a felony crime. Following a denial of his request that his registration be reinstated, Appellee Gaskin filed suit in Chancery Court for Lewis County seeking to have certain sections of the statutes in question declared unconstitutional. Appellee further asked that his voter registration be reinstated and that the suit be maintained as a class action. The parties later agreed that the action not be certified as a class action. By judgment entered March 16, 1983, the Chancellor held that "Section 8 of Chapter 345 of the Tennessee Public Acts of 1981, as codified at T.C.A. § 2–2–139(d) and § 2–19–143(4), is declared to be unconstitutional in that it violates Article I § 5 of the Tennessee Constitution." The Chancellor found that the remaining sections of Chapter 345 were not affected because of the severability clause found in Section 9 of the Act.

The determinative issue before us is whether Article I, Section 5 of the Tennessee Constitution has been violated by the statutes in question. Article 1, Section 5 provides:

The election shall be free and equal, and the right of suffrage, as hereinafter declared, shall never be denied to any person entitled thereto, except upon conviction by a jury of some infamous crime, *previously ascertained and declared by law,* and judgment thereon by court of competent jurisdiction. (Emphasis added)

The meaning of the phrase, "previously ascertained and declared by law" is decisive in resolving this question. The Appellants argue that this section, construed along with Article IV, Sections 1 and 2, require only that the legislature act before a person can be disenfranchised. Article IV, Section 1 provides in relevant part:

All such requirements [to vote] shall be equal and uniform across the state, and there shall be no other qualification attached to the right of suffrage.

The General Assembly shall have the power to enact laws requiring voters to vote in the election precincts in which they may reside, and laws to secure the freedom of elections and the purity of the ballot box.

Article IV, Section 2 provides: "Laws may be passed excluding from the right of suffrage persons who may be convicted of infamous crimes." We agree that these provisions are not self-executing.

It is true that the declaration of the right of universal suffrage is self-executing in that any citizen may rely upon it independently of any legislative enactment. However, the *exception* to universal suffrage is expressly dependent upon legislative action. That is, the legislature is empowered to deprive convicted criminals of the right to vote under the limitations set out in Article 1, Section 5 and Article IV, Section 2, but it is not reasonable to interpret the exception as self-executing. *Crutchfield v. Collins,* 607 S.W.2d 478, 481 (Tenn.App.1980).

We do not agree, however, with Appellants' position that these provisions *only* require that the legislature act in order that a person be disenfranchised. This interpretation ignores the ordinary meaning of the words "previously ascertained and declared by law" read within the context of the provision. When construing a constitutional provision we must give "to its terms their ordinary and inherent meaning." *State v. Phillips,* 159 Tenn. 546, 21 S.W.2d 4 (1929). The phrase "previously ascertained and declared by law" modifies the words "infamous crimes." It qualifies the words "infamous crimes" in the sense that it places a time limitation on when an act shall be declared infamous; that is, before conviction of the crime by a jury.

We must also "give effect to the intent of the people" who adopt a constitutional provision, and their intent should be derived from the language as it is found in the instrument. *Hatcher v. Bell,* 521 S.W.2d 799 (Tenn.1974); *Shelby v. Hale,* 200 Tenn. 503, 292 S.W.2d 745 (1956). The language is "clear and unambiguous" and the intent of the framers is easily derived therefrom. *Hatcher v. Bell, supra.* Notwithstanding this fact, we find that the history of this provision and the events and circumstances that precipitated the 1870 convention, which are succinctly set forth in Appellee's brief, are important in our understanding the spirit, if not the letter of the provision.

After the fall of Fort Donelson on February 15, 1862, the greater part of Tennessee came into the possession of the Union army. President Abraham Lincoln appointed Andrew Johnson to be military governor. For more than two years, Johnson exercised complete and dictatorial control over state government. In 1864, Johnson was nominated to run as Lincoln's Vice-President, and because he desired to obtain the free electoral vote of his own State, he permitted the Union party to call a political convention. At the 1865 convention, the party passed a resolution, purporting to be a constitutional amendment, which was to have the effect of disenfranchising anyone who had voted for or served in the secessionist government or in the Confederate army. In the presidential election of 1860, before the war, 145,000 votes had been cast in Tennessee. In the first general election in 1865, after the convention, the State's voters cast only 25,000 votes, about the number of Union army troops occupying Tennessee at the time.

Following the war, the only hope for most Tennesseans to regain the right to vote lay in the division of the ranks of the Union party. Such a division occurred between the Radical and Moderate wings of the party in 1868, when Governor W.G. Brownlow gave up his office to join the U.S. Senate. The vacant governorship descended to the Speaker of the State Senate, DeWitt Senter, who ran against W.B. Stokes in the next election. Stokes, a former secessionist legislator who turned radical after the war, campaigned on a platform of gradual reinfranchisement. Defining his platform, Stokes said: "When the killing of the Union men ceases, the hellish

organization of Ku-Klux is abandoned, and the laws are observed, then I am willing to amend the state constitution so far as to allow the disfranchised to come in gradually." Governor Senter, who had been elected to the State Senate as a radical, recognized the sentiment among the people for restoring universal suffrage. Stating his position on the issue, he said: "[T]he time has come, and is now, ... [that] the privilege of the elective franchise be restored." Governor Senter won the election by a wide margin. Stokes leveled charges of fraud and attempted to have the election set aside. Both President Grant and Congress declined to intervene in the affairs of Tennessee, and Stokes' appeals for federal action were unsuccessful.

Both Governor Senter and the newly elected legislature expressed the desire to fulfill their election pledges and restore the franchise to ex-Confederates, but there was some debate over how this would be accomplished. The simple repeal of the acts of 1866 and 1867 would have restored almost universal suffrage, but some felt that the questions to be settled were of a constitutional character, and that only a constitutional convention could adequately insure that future abuses of this kind would be prevented. The legislature enacted a bill providing for a referendum on December 18, 1869, so that voters could approve the calling of a constitutional convention. It was left for the State's citizens to decide whether the right of suffrage should be determined by the current legislature, or constitutional amendment. An overwhelming majority of the State's voters cast their ballots in favor of the convention.

. At the same general balloting, delegates were named, and in January, 1870, the convention convened in Nashville. John C. Brown, an ex-major-general of the Confederate Army was elected to preside. Among the amendments which were passed are the words of Article 1, Section 5 which are a part of our Constitution today. *See* T. Alexander, *Political Reconstruction in Tennessee* (1950); J. Patton, *Unionism and Reconstruction in Tennessee, 1860–1869* (1934); J.R. Neal, *Disunion and Restoration in Tennessee* (1899); L. Laska, *A Legal and Constitutional History of Tennessee,* 6 Mem.St. U.L.Rev. 563 (1976).

It is obvious that the 1870 constitutional convention was comprised of men who had known the injustice of retroactive disenfranchisement and were determined to safeguard themselves and future generations from similar acts of repression. That this right was preserved by constitutional amendment rather than legislative enactment accentuates its importance to the people of the State of Tennessee. We cannot ignore the reasons for which this amendment was adopted without usurping the will of the people who saw fit to include it in our constitution. Accordingly, the finding of the Chancellor, that Article I, Section 5 of the Tennessee Constitution prohibits the General Assembly from retroactively disenfranchising convicted felons who have never been adjudged infamous, is affirmed.

FONES, C.J., and COOPER, BROCK and HARBISON, JJ., concur.