IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
April 2, 2019 Session

## STATE OF TENNESSEE EX REL. RACHEL BETH HAYNES v. ALLAN VINCENT DAUGHERTY

**Appeal from the Circuit Court for Rutherford County**
No. 57095      Diana Benson Burns, Judge

_____

### No. M2018-01394-COA-R10-CV

_____

The issue in this interlocutory appeal is whether the trial court erred in requiring a cash-only appearance bond. Father, who had an arrearage judgment for failing to pay child support, was arrested and incarcerated pursuant to an order of attachment under Tenn. Code Ann. § 36-5-101(f)(2). The trial court set an appearance bond, without an evidentiary hearing, at the full amount of the alleged arrearage, $13,413.45, and restricted the bond to cash. The order also directed that, upon payment of the cash bond, the funds were to be forwarded immediately to the State Disbursement Unit and applied to Father's arrears. In subsequent hearings, the trial court denied Father the right to post a secured bond, and this Tenn. R. App. P. 10 Extraordinary Appeal followed. First, we hold that the trial court violated Father's constitutional rights under Article I, section 15 of the Tennessee Constitution and under the equal protection guarantees of both the Tennessee and United States Constitutions by imposing a cash-only appearance bond. Second, we hold that the trial court violated Father's due process rights under both the state and federal constitutions by imposing a $13,413.45 cash-only bond as a means to collect a civil debt and ordering that the bond be immediately applied in satisfaction of the alleged debt, without an evidentiary hearing. Finally, we hold that the trial court misconstrued the applicable statute, Tenn. Code Ann. § 36-5-101(f)(2), as allowing it to use the appearance bond solely as a means to collect the alleged arrears, rather than as a means to ensure Father's appearance for legal proceedings. Therefore, because the trial court failed to identify and apply the appropriate legal principles, both statutory and constitutional, and its decision was not supported by an evidentiary foundation, the decision constituted an abuse of discretion. Because the trial court erred in requiring a cash-only appearance bond, the judgment of the trial court is reversed, the amount of bond shall be $1,000, which Father may post with sufficient sureties, and the case is remanded for further proceedings as may be necessary.

**Tenn. R. App. P. 10 Extraordinary Appeal; Judgment of the Circuit Court
Reversed and Remanded**

FRANK G. CLEMENT JR., P.J., M.S., delivered the opinion of the Court, in which D. MICHAEL SWINEY, C.J., joined. W. NEAL MCBRAYER, J., filed a separate opinion concurring in part and dissenting in part.

Paul Andrew Justice, III, Murfreesboro, Tennessee, for the appellant, Allan Vincent Daugherty.

Herbert H. Slatery, III, Attorney General and Reporter; Andrée Sophia Blumstein, Solicitor General; and Alexander S. Rieger, Deputy Attorney General, Nashville, Tennessee, for the appellee, State of Tennessee *ex rel*. Rachel Beth Haynes.

## OPINION

Allan Daugherty ("Father") and Rachel Haynes ("Mother") were divorced in the Rutherford County Circuit Court in 2008. The court designated Mother as the primary residential parent of the couple's three minor children, and Father was ordered to pay $144.25 weekly in child support. On May 6, 2015, following a hearing on Mother's petition for Father's failure to pay child support as ordered, the court established a child support arrearage against Father in the amount of $2,453.97 and ordered Father to pay Mother $573 per month in child support.

On September 7, 2017, the State of Tennessee (the "State") filed a petition for civil contempt against Father, on behalf of Mother, alleging Father failed to pay child support as ordered by the court. Shortly following, Father requested and was provided with counsel. At a hearing in December 2017, Father and the State entered into an agreed order, which stated that Father owed $10,288.57 in child support and provided that Father would pay $600 per month, which added $27 per month to the current support award of $573 to satisfy the latest arrearage. The court did not make a specific finding of civil contempt; however, citing Tenn. Code Ann. § 36-5-101(f)(2),[1] the order provided that "if

---

[1] Tennessee Code Annotated § 36-5-101(f)(2) provides:

[I]f a parent is more than thirty (30) days in arrears, the clerk of the court may, upon written application of the obligee parent, a guardian or custodian of the children, or the department of human services or its contractors in Title IV-D support cases, issue a summons or, in the discretion of the court, an attachment for such parent, setting a bond of not less than two hundred fifty dollars ($250) or, in the discretion of the court, up to the amount of the arrears, for such other proceedings as may be held in the matter. In addition, the court may, at any time, require an obligor parent to give security by bond, with sufficient sureties approved by the court, or, alternatively, in the absence of the judge from the court, approved by the clerk of the court, for payment of past, present, and future support due under the order of support. If the obligor parent thereafter fails to appear or fails without good cause to comply with the order of support, such bonds may

- 2 -

[Father] fails to pay child support as ordered for a thirty day period, an automatic attachment may issue for his/her arrest upon filing of proposed Order with pay record attached."

On June 11, 2018, the State filed a proposed "Order for Attachment" with the pay record attached alleging Father had made no child support payments since January 2018. The order proposed by the State provided that an attachment "shall issue for the Respondent's arrest with [a] **cash bond of** $13,413.45," which was the amount of child support Father owed. (Emphasis in original). The proposed "Order for Attachment" also stated, "Upon payment of cash bond, funds shall be forwarded instanter to [the State Disbursement Unit] and applied towards the Respondent's arrears." The child support magistrate signed the "Order for Attachment" that same day, and the subsequent "Attachment" issued by the court ordered the sheriff to arrest Father and to bring him before the Rutherford County Circuit Court on July 25, 2018. It also directed the sheriff to take a cash bond of $13,413.45, "conditioned for his appearance at the time and place shown above."

Father was arrested on June 14, 2018, and because he could not pay the cash-only bond, he remained incarcerated until June 20, when he appeared in court. Rather than request a hearing or the appointment of counsel, Father reached an agreement with the Assistant District Attorney that reduced Father's bond to $6,000. The Agreed Order also provided that upon payment of $300, Father would be released to "serve weekends at the Rutherford County Adult Detention Center . . . until the remaining $5,700 is paid in full." Because Father argued that a medical condition prevented him from maintaining employment, the court ordered Father to bring proof of his medical condition to the hearing set for July 25, 2018, as provided in the "Attachment."

Sometime after the June hearing, Father obtained counsel and then filed a "Request for Hearing before Judge and Motion to Quash Illegal Attachment." In his motion, Father contended that the "Attachment" was illegal because it restricted payment of the bond to cash. Moreover, Father argued that the court's subsequent June 20, 2018 order effectively "sentenced [him] to two days in jail per week until the end of time," without ever finding him in contempt and without ever determining whether Father had the ability to pay. Father asked the court to review the June 20 order and "quash the attachment in its entirety." After a hearing on July 6, the court denied the motion.

At the hearing on July 25, 2018, the court found that aside from one weekend, Father had "failed to either serve the 48 hours per week or pay the cash bond as

---

be forfeited and the proceeds from the bonds paid to the court clerk and applied to the order of support.

previously ordered." The court asked Father if he was willing to comply with the June 20 Agreed Order, and Father, through counsel, continued to argue that the order was invalid. Therefore, the court ruled:

> Accordingly, in that Respondent refuses to comply with the terms of said Agreed Order, the Court finds it appropriate to set such order aside and to restore the status of this proceeding to that which was in effect prior to the entry of the Agreed Order. Pursuant to Tenn. Code Ann. § 36-5-101(f)(2), Respondent is remanded into the custody of the Rutherford County Sheriff's Department with cash bond in the amount of $13,413.45. This matter is set for further hearing on August 9, 2018, for Respondent to show cause why he should not be found in contempt for failing to comply with the Orders of the court.

Father filed an extraordinary appeal pursuant to Tenn. R. App. P. 10, and this court granted review to consider whether the trial court erred by requiring a cash-only appearance bond.[2]

### STANDARD OF REVIEW

Bond, in general, is reviewed under an abuse of discretion standard, *see Graham v. Gen. Sessions Court of Franklin Cty.*, 157 S.W.3d 790, 793 (Tenn. Ct. App. 2004), and the statute at issue, Tenn. Code Ann. § 36-5-101(f)(2), uses "may" and "in the discretion of the court." Thus, the type and amount of bond a court may require constitutes a discretionary decision.

Discretionary decisions require "a conscientious judgment, consistent with the facts, that takes into account the applicable law." *White v. Beeks*, 469 S.W.3d 517, 527 (Tenn. 2015) (citing *Lee Med. Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010)). "Discretionary decisions must take the applicable law and the relevant facts into account." *Lee Med. Inc.*, 312 S.W.3d at 524. Thus, there should be a "factual basis for the decision that is properly supported by evidence in the record," the trial court should have "properly identified and applied the most appropriate legal principles applicable to the

---

[2] Although this court reduced Father's bond to $1,000 and allowed it to be paid via bondsman, we determined, and the State concedes, that the issue on appeal remains justiciable because it is capable of repetition. While the mootness doctrine requires that a genuine controversy exist, "[a] court may review the merits of an appeal when the . . . appeal involves issues capable of repetition yet evading review." *State v. Rogers*, 235 S.W.3d 92, 97 (Tenn. 2007). To meet this exception to the mootness doctrine, "there must be a reasonable expectation that the acts provoking the litigation will reoccur, that judicial remedies may not be effective if the acts do reoccur, and that the same party will be prejudiced." *Id.* Having determined that the case sub judice meets the foregoing criteria, we will proceed on the merits.

decision," and the trial court's decision should be "within the range of acceptable alternative dispositions." *Id*. (citation omitted).

When an appellate court is called upon to review a trial court's discretionary decision, it reviews the underlying factual findings using the preponderance of the evidence standard contained in Tenn. R. App. P. 13(d) and reviews the trial court's legal determinations de novo without any presumption of correctness. *Id*. at 525. Following a review pursuant to these standards, if we determine that the trial court's judgment is not based on the applicable legal principles or relevant facts, an abuse of discretion may be found. *Gooding v. Gooding*, 477 S.W.3d 774, 783 (Tenn. Ct. App. 2015).

Based on the foregoing, we shall determine whether the trial court properly identified and applied the relevant legal principles and whether there is a factual basis for the decision requiring Father to post a cash-only appearance bond.

## ANALYSIS

Father concedes that § 36-5-101(f)(2) does not expressly prohibit cash-only appearance bonds; however, he argues that when read together with the bail statutes in Title 40 of the Tennessee Criminal Code, which do prohibit cash-only bonds, the court does not have the discretion to require a cash-only bond in a child support enforcement action. Father also argues that even if the criminal bail statutes do not apply, cash-only bonds violate Article I, section 15 of the Tennessee Constitution, which guarantees the right to bail with sufficient sureties. For its part, the State argues that § 101(f)(2) permits cash-only appearance bonds, and both Title 40 of the Tennessee Criminal Code and Article I, section 15 of the Tennessee Constitution are inapplicable to this case.

Questions of statutory interpretation are questions of law, which we review de novo, without a presumption of correctness. *Beard v. Branson*, 528 S.W.3d 487, 495 (Tenn. 2017). In interpreting statutes, it is the duty of the courts "to effectuate legislative intent." *Kyle v. Williams*, 98 S.W.3d 661, 664 (Tenn. 2003). "Legislative intent is to be ascertained primarily from the natural and ordinary meaning of the language used." *Id*. If the language in a statute is unambiguous, "we must apply its plain meaning without a forced interpretation that would limit or expand the statute's application." *State v. Walls*, 62 S.W.3d 119, 121 (Tenn. 2001); *see Gleaves v. Checker Cab Transit Corp.*, 15 S.W.3d 799, 803 (Tenn. 2000) (reasoning "it is not for the courts to alter or amend a statute"). When construing a statute, it is also incumbent upon the court "to adopt a construction which will . . . avoid constitutional conflict if any reasonable construction exists that satisfies the requirements of the Constitution." *Davis-Kidd Booksellers, Inc. v. McWherter*, 866 S.W.2d 520, 529 (Tenn. 1993).

Tennessee Code Annotated § 36-5-101(f)(2) provides:

[I]f a parent is more than thirty (30) days in arrears, the clerk of the court may, upon written application of the obligee parent, a guardian or custodian of the children, or the department of human services or its contractors in Title IV-D support cases, issue a summons or, in the discretion of the court, an attachment for such parent, setting a bond of not less than two hundred fifty dollars ($250) or, in the discretion of the court, up to the amount of the arrears, for such other proceedings as may be held in the matter. In addition, the court may, at any time, require an obligor parent to give security by bond, with sufficient sureties approved by the court, or, alternatively, in the absence of the judge from the court, approved by the clerk of the court, for payment of past, present, and future support due under the order of support. If the obligor parent thereafter fails to appear or fails without good cause to comply with the order of support, such bonds may be forfeited and the proceeds from the bonds paid to the court clerk and applied to the order of support.

Section 101(f)(2) is concerned with two types of bonds—an appearance bond and a compliance bond. As to the compliance bond, which is not at issue here, the statute permits the court to "require an obligor parent to give security by bond, ***with sufficient sureties***[.]" Tenn. Code Ann. § 36-5-101(f)(2) (emphasis added). The statute omits the phrase "with sufficient sureties" when referring to the appearance bond.[3] *See id*. Thus, the statute does not expressly permit, nor does it expressly forbid cash-only appearance bonds; however, we have determined that the trial court erred by not considering the constitutional constraints in requiring a cash-only bond.

## I. ARTICLE I, SECTION 15

Article I, section 15 of the Tennessee Constitution provides, in relevant part, "[t]hat all prisoners shall be bailable by sufficient sureties, unless for capital offenses, when the proof is evident, or the presumption great." Father argues that this constitutional guarantee of bail with sufficient sureties prohibits cash-only appearance bonds in child support enforcement actions. The State argues, however, that Article I, section 15 does not apply in this case because the constitutional right to bail was intended to safeguard the presumption of innocence, that is, to prevent the criminal accused from being punished prior to conviction. The State contends that, unlike criminal actions, Father was not presumed innocent of civil contempt. According to the State, when the pay records

---

[3] The Tennessee Supreme Court has recognized two types of "appearance bonds": (1) a "cash deposit bond," which is "a sum of money in cash equal to the amount of bail"; and (2) a "secured" bond, which is secured by real estate or third parties, including professional bail bondsmen. *State v. Clements*, 925 S.W.2d 224, 225 (Tenn. 1996).

were submitted with the proposed Order of Attachment showing that Father failed to pay child support, a presumption arose that Father was in contempt.

When construing a constitutional provision, we must "give effect to the intent of the people" who adopted it, and we ascertain that intent from the plain and ordinary meaning of the language used. *Gaskin v. Collins*, 661 S.W.2d 865, 867 (Tenn. 1983) (quoting *Hatcher v. Bell*, 521 S.W.2d 799, 803 (Tenn. 1974)). However, equally important to our understanding of the "spirit, if not the letter" of Article I, section 15 is an examination of the events and circumstances precipitating its adoption. *See id*. Thus, we also look to the provision's history to grasp its meaning and purpose. *See id*.

The origins of Article I, section 15, and the bail system in general, date back to Anglo-Saxon England. June Carbone, *Seeing through the Emperor's New Clothes: Rediscovery of Basic Principles in the Administration of Bail*, 34 Syracuse L. Rev. 517, 519 (Spring 1983). At that time, most judgments, whether criminal or civil in nature, were reduced to monetary judgments called "bots." *Id*. at 519 and 520 n.13. When the aggrieved party brought a legal action against the defendant for a civil or criminal wrong, the defendant's bail was set at the amount of the bot. *Id*. at 519–520. The defendant was then required to secure a surety—a trusted third party—who would guarantee, in the form of a pledge, both the appearance of the defendant at trial and payment of the bot upon conviction. *Id*. at 520. If the defendant failed to appear at trial, he was presumed guilty, and the surety had to pay the bot. *Id*. Thus, the primary reason for bail was to ensure that the victim was compensated. *Id*. at 521.

Following the Norman Conquest, the government, rather than private citizens, began to take responsibility for criminal prosecutions, and corporeal punishment gradually replaced the bot for criminal offenses. *Id*. At the same time, England's Magna Carta of 1215 provided that "[n]o freeman shall be taken, or imprisoned, or be disseised of his Freehold, or Liberties . . . but by lawful Judgment of his Peers, or by the Law of the Land." Matthew J. Hegreness, *America's Fundamental and Vanishing Right to Bail*, 55 Ariz. L. Rev. 909, 917 (2013). The terms of Magna Carta thereafter "established the principles of due process embodied by the right to bail," and in essence, it made all offenses bailable.[4] *Id*. But, the transition from monetary judgments to corporeal punishment made bail more complicated to administer. Carbone, *supra*, at 522. A defendant facing the threat of bodily harm had a greater incentive to flee than a defendant facing a fine. *Id*. And, under such circumstances, judicial officers possessed no sure formula for calculating the amount of bail or the number of sureties necessary to secure a defendant's appearance at trial. *Id*.

---

[4] The distinction between civil and criminal offenses "was cloudy . . . at the time of Magna Carta." *Browning-Ferris Indus. of Vermont, Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 272 (1989).

During this period, the local sheriff "enjoyed enormous discretion in setting bail."[5] *Id*. at 523. This system, however, was rife with corruption, and in 1275, Parliament enacted the Statute of Westminster to limit the sheriffs' discretion. *Id*. The Statute of Westminster was the first to delineate between bailable and unbailable offenses. *Id*. However, the terms "bailable" and "unbailable" are somewhat misleading. *Id*. at 523 n.35. An "unbailable" offense did not necessarily mean that the alleged offender would be denied pretrial release on bail. *Id*. When the offense was deemed "bailable," the sheriff automatically set bail and released the defendant to a surety. *Id*. at 523; Hegreness, *supra*, at 918. When the offense was deemed "unbailable," a higher court made the determination. Carbone, *supra*, at 523 n.35. In many cases, the decision to release the defendant on bail, under the Statute of Westminster, was based on the seriousness of the offense, the likelihood of conviction, and whether the accused was of "ill fame." *Id*. at 526. Offenses that were deemed bailable with "Sufficient surety" included petty larceny, receipt of felons, and trespass. 3 Edw., ch. 15 (1275). And, in a catch-all provision, all offenses not punished corporally were bailable. Carbone, *supra*, at 525.[6]

English settlers in America brought the Statute of Westminster and Magna Carta across the Atlantic. Hegreness, *supra* at 916–17. However, the English bail system was not so easy to administer in the United States and had to be adapted. The English common law concept of "sufficient surety," for example, proved difficult to apply. Joseph Buro, Note, *Bail—Defining Sufficient Sureties: The Constitutionality of Cash-Only Bail*. State v. Briggs*, 666 N.W. 2d 573 (Iowa 2003).*, 35 Rutgers L.J. 1407, 1421 (2004). In England, citizens were tied to the land, and in most towns, individuals with bail authority were well-acquainted with the locals. *Id*. Consequently, those with the authority to set bail were in a better position to judge the trustworthiness of a defendant and a surety. *Id*.

To the contrary, the United States "was a developing nation, with a vast frontier," where the accused's ties to the community and land were much weaker. *Id*. This made it difficult for officials to judge whether the defendant could be trusted to appear at trial or whether the surety was sufficient. *Id*. Moreover, third parties were no longer willing to risk acting as a surety when the accused was more likely to flee and most people had no

---

[5] Bail authority was transferred to justices of the peace in the 14th century. *Id*. at 527 n.46.

[6] Contemporaneously with the Statute of Westminster and Magna Carta, the concept of Habeas Corpus developed. Hegreness, *supra*, at 918. Habeas Corpus (which in Latin means, "You shall have the body") was a mechanism by which a person could obtain release when unlawfully detained by the sheriff for a bailable offense. *Id*. This mechanism was later codified in the Habeas Corpus Act of 1679. *Id*.

means for conducting nationwide searches to detain a fleeing defendant. *Id*. at 1421–22. These unique circumstances led to the formation of commercial bonding companies at the turn of the 19th century. *Id*. at 1422; Peggy M. Tobolowsky, James F. Quinn*, Drug-Related Behavior as a Predictor of Defendant Pretrial Misconduct*, 25 Tex. Tech L. Rev. 1019, 1019 n.2 (1994). At the same time, there is historical evidence that the definition of "surety" broadened in America and came to mean any type of security that would ensure a defendant's appearance at trial, even the cash itself. *See* Hegreness, *supra*, at 939–40.

The English settlers in America also found the Statute of Westminster's categories of bailable and unbailable offenses to be confusing and conflicting. Carbone, *supra*, at 529. To simplify the administration of bail, Pennsylvania adopted a "Right to Bail" provision, which first appeared in the Pennsylvania Frame of Government of 1682, and provided that that "all Prisoners shall be bailable by sufficient sureties, unless for capital offenses where the proof is evident or the presumption great . . . ." *See* Carbone, *supra*, at 529–31; *see also* Hegreness, *supra*, at 920. At that time, "willful murder" was the only capital offense in Pennsylvania.[7] Carbone, *supra*, at 531. Therefore, the "Right to Bail" provision in the Pennsylvania Frame of Government of 1682 guaranteed bail with sufficient sureties to most every prisoner, removing much of the court's discretion to decide who was eligible for bail, except for prisoners accused of capital offenses. *See id*. at 531–32; Hegreness, *supra*, at 938–39.

But, there was another more important reason for limiting the court's discretion in determining who was eligible for bail, and it arose out of the Quakers' experience of religious persecution and wrongful imprisonment in England.[8] *See* Alfred L. Brophy, *Of*

---

[7] However, if the defendant was a black man in Pennsylvania, he could be executed for rape, bestiality, and burglary. *Id*. at 531 n.69.

Prior to the Pennsylvania Frame of Government of 1682, Massachusetts enacted the Massachusetts Body of Liberties in 1641, which provided:

> No mans person shall be restrained or imprisoned by any Authority whatsoever before the law hath sentenced him thereto. If he can put in sufficient securitie, bayle or mainprise, for his appearance, and good behavior in the meane time, unlesse it be Crimes Capital, and Contempts in open Court, and in such cases where some expresse act of Court [legislature] doth allow it.

Carbone, *supra*, at 530 n.61 (quoting The Colonial Laws of Massachusetts § 8, at 37 (W. Whitmore ed. 1889)). However, among the list of capital offenses in Massachusetts were blasphemy, adultery, witchcraft, and "Child over 16 years old cursing and smiting his parent," *Id*. at 530 n.63.

[8] Pennsylvania would become a "bastion of religious pluralism," attracting many people of other oppressed minority religions in Europe—Mennonites, Moravians, Dunkers, Amish, Lutherans, and Baptists. Gary S. Gildin, *Coda to William Penn's Overture: Safeguarding Non-Mainstream Religious Liberty under the Pennsylvania Constitution*, 4 U. Pa. J. Const. L. 81, 92 (2001).

*"Good Laws" and "Good Men" . . . A Review*, 69 Temp. L. Rev. 843, 846–47 (1996) (book review); Paul Lermack, *The Law of Recognizances in Colonial Pennsylvania*, 50 Temp. L.Q. 475, 477 (1977). It was well-known that the religion's founder, George Fox, and fellow Quaker, Edward Pyott were arrested for distributing religious literature and imprisoned for nine weeks awaiting trial. Brophy, *supra*, at 846. Pennsylvania's founder, William Penn, while still in England, was imprisoned a number of times for crimes such as unlawful preaching and was incarcerated without trial for several months in the Tower of London.[9] Gildin, *supra*, at 90; Lermack, *supra*, at 477. And, it was not uncommon for Quakers to be imprisoned for contempt of court for refusing to remove their hats. Lermack, *supra*. Thus, the founders of Pennsylvania were intimately acquainted with the bail system in England, and their common experience of religious persecution and imprisonment spurred them in their quest to limit the scope and power of the judiciary where bail was concerned.[10] *See id*.

Moreover, and pertinent here, the Pennsylvania colonists had a particular concern for civil defendants when it came to pretrial imprisonment. William M. Offutt, Jr., *Of "Good Laws" & "Good Men" Law and Society in the Delaware Valley, 1680-1710* 64 (1995). The arrest and incarceration of a civil defendant was heavily regulated in Pennsylvania. *Id*. A land owner could not be arrested for a civil wrong without evidence that he was about to flee. *Id*. And, those who did not own land could be arrested only if potential flight and lack of security were proved. *Id*.

The "Right to Bail" provision in the Pennsylvania Frame of Government of 1682 was later included verbatim in the Pennsylvania Constitution of 1790 as Article IX,

---

[9] Due to his experience of persecution and imprisonment in England, William Penn published and distributed the complete text of Magna Carta to the colonists in Pennsylvania to apprise them of their rights. Patrick K. Greene, Stan A. Lehman, *A Good Day at Runnymede*, 52-NOV Ariz. Att'y 36, 39 (Nov. 2015); *see* William C. Koch, Jr., *Reopening Tennessee's Open Courts Clause: A Historical Reconstruction of Article I, Section 17 of the Tennessee Constitution*, 27 U. Mem. L. Rev. 333, 364–65 (1997).

[10] We are unaware of any decisions where the Pennsylvania Supreme Court has conducted a historical analysis of its "Right to Bail" provision to determine its meaning and purpose. In *Com. v. Truesdale*, the Court found that "[b]ail was conceived as a means for securing the accused's presence at trial, while at the same time according him liberty prior to trial so he could prepare his case." 296 A.2d 829, 836 (Penn. 1972). Pennsylvania's current provision is found in Article I, section 14 of the Pennsylvania Constitution and was amended in 1998 to read: "All prisoners shall be bailable by sufficient sureties, unless for capital offenses or for offenses for which the maximum sentence is life imprisonment or unless no condition or combination of conditions other than imprisonment will reasonably assure the safety of any person and the community when the proof is evident or presumption great . . . ."

section 14.[11] When Tennessee held its constitutional convention in 1796, a mere six years later, 24 of the Tennessee delegates were former residents of either Virginia or Pennsylvania, and at least five of the delegates from Pennsylvania served on Tennessee's drafting committee.[12] Koch, *supra*, at 382 and 384. While no records were kept of the committee's deliberations concerning Tennessee's Bill of Rights, which included a "Right to Bail" provision, a textual analysis readily reveals the influence of the Pennsylvania Constitution. *Id*. at 386–87. Sixteen of the 32 sections that comprised Tennessee's Bill of Rights were derived in whole or in part from the Pennsylvania Constitution. *Id*. at 387. Article XI, section 15 of the Tennessee Constitution of 1796, which would later become Article I, section 15 in 1834[13], is a verbatim recitation of Article IX, section 14 of the Pennsylvania Constitution of 1790, and consequently, the "Right to Bail" provision of the Pennsylvania Frame of Government.[14]

---

[11] The "Right to Bail" provision also appears in the Pennsylvania Constitution of 1776, ch. ii, § 28: ". . . . All prisoners shall be bailable by sufficient sureties, unless for capital offences, when the proof is evident, or presumption great."

[12] One Pennsylvania delegate of note was Joseph McMinn, who was born in 1758 near Westchester, Pennsylvania and raised in a Quaker family. Nancy Boswell Kincaid, *Joseph McMinn Governor of Tennessee, 1815-1821*, *in* Governors of Tennessee, I 1790-1835, 97 (Charles W. Crawford, ed., 1979). After moving with his family to Hawkins County, Tennessee in 1787, he served as an officer in the Hawkins County militia and as a justice of the peace. *Id*. at 97–98. It was upon his motion that the Bill of Rights was added to the Tennessee Constitution. *Id*. at 98. McMinn would later become the fourth governor of Tennessee. *Id*. at 97.

[13] Delegates to Tennessee's second constitutional convention in 1834 decided to move Tennessee's Bill of Rights to Article I. Koch, *supra*, at 393.

[14] Article IX, section 14 of the Pennsylvania Constitution of 1790 reads: "That all prisoners shall be bailable by sufficient sureties, unless for capital offenses, when the proof is evident or the presumption great, and the privilege of the writ of habeas corpus shall not be suspended unless when, in cases of rebellion or invasion, the public safety may require it."

Article XI, section 15 of the Tennessee Constitution of 1796 reads: "That all prisoners shall be bailable by sufficient sureties, unless for capital offenses, when the proof is evident or the presumption great, and the privilege of the writ of Habeas Corpus shall not be suspended unless when in case of rebellion or invasion the public safety may require it."

The language of Article I, section 15 of the Tennessee Constitution of 1870, the current version of the provision, varies only slightly: "That all prisoners shall be bailable by sufficient sureties, unless for capital offenses, when the proof is evident, or the presumption great. And the privilege of the writ of Habeas Corpus shall not be suspended, unless when in case of rebellion or invasion, the General Assembly shall declare the public safety requires it."

Like the framers of Pennsylvania's constitution, our framers were deeply concerned with individual liberty, and our bill of rights sought first and foremost to curb the government's power. *Davis v. Davis*, 842 S.W.2d 588, 599–600 (Tenn. 1992). Thus, other than to secure the accused's appearance at trial, Article I, section 15 was adopted primarily to protect the pretrial liberty interests of the accused and to provide for a consistent administration of bail. *See* Carbone, *supra*, at 529–31; *See State v. Burgins*, 464 S.W.3d 298, 303 (Tenn. 2015) (In discussing Article I, section 15, the Court states, "Pretrial bail . . . accommodates the defendant's interest in pretrial liberty and 'society's interest in assuring the defendant's presence at trial.'" (quoting Donald B. Verrilli, Jr., Note, *The Eighth Amendment and the Right to Bail: Historical Perspectives*, 82 Colum. L. Rev. 328, 329-30 (1982))). To achieve the latter two purposes, Article I, section 15 limited the court's discretion in determining who was entitled to pretrial release on bail. *See* Carbone, *supra*, at 529–531; *see also* Hegreness, *supra*, at 938–39. All prisoners were bailable with sufficient sureties, except for those accused of capital offenses. *See* Hegreness, *supra*, at 938–39.

As the legal system in England and the United States evolved, other justifications for the right to bail developed. *See* Note, *Bail: An Ancient Practice Reexamined,* 70 Yale L. J. 966, 969. (May 1961). Significantly, and pertinent to the State's arguments here, there is evidence that as early as the eighteenth century, the legal community in England made the explicit connection between the right to bail and the presumption of innocence. *See* François Quintard-Morénas. *The Presumption of Innocence in the French and Anglo-American Legal Traditions*, 58 Am. J. Comp. L. 107, 126 and 144 n.352 (2010). In the United States, this connection came to prominence with *Stack v. Boyle*, 342 U.S. 1, 4 (1951), and the subsequent enactment of the federal Bail Reform Act of 1966, 80 Stat. 214 (repealed 1984). *Id*. at 144.

Based on the foregoing, we find no historical evidence that our framers were only concerned with preserving the presumption of innocence when Article I, section 15 was adopted. The presumption of innocence is a concept generally limited to criminal law,[15] but the liberty interests that the right to bail protects are not so limited. *See* Hegreness, *supra*, at 931–32 and 951. The right to pretrial release on bail is premised on Magna Carta's broader due process guarantee, of which the presumption of innocence is but one derivative. *See Burgins*, 464 S.W.3d at 303–04; *see also* Hegreness, *supra*, at 931–32 and 951.

---

[15] *See* Quintard-Morenas, *supra*, at 107 ("No legal principle of criminal law and procedure has generated more interest and debate than the rule that one is presumed innocent until proven guilty in a court of law.")

This conclusion is supported by our Supreme Court's discussion of Article I, section 15 in *State v. Burgins*:

> The liberty interest of a defendant in continued pretrial release includes "many of the core values of unqualified liberty and its termination inflicts a 'grievous loss' on the [defendant] and often on others." As noted above, pretrial bail allows the defendant to participate in a wide range of activities that are important to the administration and preservation of justice and the presumption of innocence before conviction. Moreover, pretrial bail allows defendants to preserve the continuity of familial relationships and to provide financially for their families.

464 S.W.3d at 307 (citations omitted). Though the Tennessee Supreme Court has never squarely addressed whether this right applies in civil cases, the Court described the right to bail as rooted in the "core values of unqualified liberty," and found that the right to pretrial release on bail was important to both the administration of justice and the preservation of familial relationships, interests that are equally important in civil law. *See id*.

Moreover, our historical analysis leads us to conclude that irrespective of whether the action was civil or criminal in nature, our framers intended for Article I, section 15 to apply to any action resulting in pretrial imprisonment. From the Anglo-Saxon period forward, the law consistently permitted bail with sufficient surety for offenses not punished corporally, which included civil offenses. *See* Carbone, *supra*, at 519–25; *see also Browning-Ferris Industries of Vermont, Inc.*, 492 U.S. at 272 (noting that the "distinction between civil and criminal law was cloudy . . . at the time of Magna Carta"). This made sense, considering that one of the reasons for bail was to secure the defendant's appearance at trial, and those facing monetary judgments were less likely to flee than those facing corporal punishment. *See* Carbone, *supra*, at 522. Even more important, to hold that Article I, section 15 only applied in criminal cases, would ignore the broader liberty interests that this provision protects, and it would undermine the framers' intent to have a consistent administration of bail. *See Burgins*, 464 S.W.3d at 303–304 and 307; *see also Carbone*, *supra*, at 529–31. This conclusion is supported by the plain language of the provision, which provides that "all prisoners shall be bailable by Sufficient Sureties . . . ." Tenn. Const. art. I, § 15. The phrase "all prisoners" strongly indicates that Tennessee's founders intended that Article I, section 15 apply to any action leading to pretrial imprisonment, which today, includes child support enforcement actions.

Applying Article I, section 15 to this case, we find persuasive this court's reasoning in a previous decision that trial courts do not have the discretion to require a cash-only appearance bond:

If the judge were held to have discretion to require a cash-only bond, he would also arguably have the power, for instance, to demand that a defendant put up qualifying real estate in order to secure his release. If a particular defendant had no qualifying real estate, such a requirement could effectively detain the accused in violation of Article I, § 15 of the Tennessee Constitution and T.C.A. § 40-11-102 which provide that "all defendants shall be bailable by sufficient sureties." The same result could arise if a cash-only deposit was required of a defendant who had real estate or other sufficient surety, but no cash.

*Lewis Bail Bond Co. v. General Sessions Ct. of Madison Cty*, No. C-97-62, 1997 WL 711137, at *5 (Tenn. Ct. App. Nov. 12, 1997).

Some courts have held that cash-only bonds are constitutional under their "Right to Bail" provisions; however, we do not find those decisions persuasive. *See Ex parte Singleton*, 902 So.2d 132 (Ala. Crim. App. 2004); *Trujillo v. State*, 483 S.W.3d 801 (Ark. 2016); *Fragoso v. Fell*, 111 P.3d 1027 (Ariz. Ct. App. 2005); *State v. Briggs*, 666 N.W.2d 573 (Iowa 2003); *State v. Jackson*, 384 S.W.3d 208 (Mo. 2012); *State v. Gutierrez*, 140 P.3d 1106 (N.M. Ct. App. 2006); *Saunders v. Hornecker*, 344 P.3d 771 (Wyo. 2015). For example, the Iowa Supreme Court interpreted "surety" to include any type of security, whether it be the cash itself or a bail bondsman. *Briggs*, 666 N.W.2d at 581–82. Relying on that definition, the Court held that Iowa's "bail with sufficient sureties" guarantee gave the court the discretion to determine what type of surety was sufficient. *Id.* at 583. Therefore, the Iowa court reasoned that cash-only bonds were constitutional if the court determined that a cash-only bond was sufficient to guarantee the defendant's appearance for the proceedings. *Id.*

The Tennessee Attorney General has issued two opinions suggesting that Article I, section 15 of the Tennessee Constitution does not permit cash-only appearance bonds in a number of legal actions, including child support enforcement actions. *See* Tenn. Att'y Gen. Op. No. 03-054, *Constitutionality of Proposed Legislation Granting Judges the Authority to Order a Cash Deposit Bond in Certain Cases* (2003); *see also* Tenn. Att'y Gen. Op. No. 13-62, *Cash Bonds for Child Support Attachments under Tenn. Code Ann. § 36-5-101(f)(2)* (2013). More specifically, in Opinion No. 13-62, the Attorney General states:

Neither the plain language of Tenn. Code Ann. § 36-5-101(f)(2) nor any other portion of Tenn. Code Ann. § 36-5-101 requires the conclusion that a "bond of not less than two hundred fifty dollars ($250) or, in the discretion of the court, up to the amount of the arrears" means only a cash bond. This conclusion is supported by Article I, Section 15, of the Tennessee Constitution, which provides "[t]hat all prisoners shall be bailable by sufficient sureties, unless for capital offenses, when the proof is evident, or

the presumption great." This Office has previously opined that proposed legislation "permitting a judge to restrict the type of bail that a defendant may post to a cash deposit bond" violated the Tennessee Constitution's requirement of bail by "sufficient sureties," as "the legislation could effectively deny bail to those defendants who have property available or who have the ability to secure the help of a professional bondsman or other responsible individuals, but who do not have the requisite cash."

(Citations omitted).

We find the opinion of the Attorney General of Tennessee well-reasoned and more persuasive than that of the Iowa Supreme Court. We also note that several other state courts hold, as we do, that cash-only bail violates similar provisions in their state constitutions. *See State v. Golden*, 546 So. 2d 501, 503 (La. Ct. App. 1989); *State v. Brooks*, 604 N.W.2d 345, 352–53 (Minn. 2000); *State ex rel. Jones v. Hendon*, 609 N.E.2d 541, 543–44 (Ohio 1993); *State v. Hance*, 910 A.2d 874, 882 (Vt. 2006); and *State v. Barton*, 331 P.3d 50, 53–56 (Wash. 2014).

When ascertaining the meaning of "sufficient sureties" in Article I, section 15, this court is called upon to consider both the letter ***and*** spirit of our constitution. *See Gaskin*, 661 S.W.2d at 867. We agree that there is historical evidence suggesting that the term "surety" had a broader definition that included the cash itself; however, we do not conclude, as the Iowa Supreme Court did, that cash-only bonds are constitutional if they are deemed "sufficient" to ensure the defendant's appearance at trial. *See Briggs*, 666 N.W.2d at 583. As previously stated, a cash-only bail requirement can effectively deny bail in many cases. *See Lewis Bail Bond Co.*, 1997 WL 711137, at \*5. Allowing the court the discretion to require a cash-only appearance bond where a bond with sufficient sureties is a reasonable option would violate the spirit of Article I, section 15, which is to limit the court's discretion in determining who is entitled to pretrial release.

## II.    EQUAL PROTECTION

We also find that a trial court's discretion to require a cash-only appearance bond is constrained by the equal protection guarantees of the United States and Tennessee Constitutions.

One of the primary purposes of an appearance bond in a criminal action and in a civil action is to ensure the defendant's appearance for future legal proceedings. Yet, in this case, and for reasons not supported by the record, the trial court treated Father, a defendant in a child support enforcement action, more harshly than it would a defendant in a criminal action by requiring a cash-only bond. *See* Tenn. Code Ann. § 40-11-102 (providing that "all defendants shall be bailable by sufficient sureties . . . ."); *see also*

Tenn. Code Ann. § 40-11-122 (permitting criminal defendants to execute bail bonds in lieu of a cash deposit).[16]

Both the Constitution of the United States and the Tennessee Constitution guarantee equal protection of the laws. *Gallaher v. Elam*, 104 S.W.3d 455, 460 (Tenn. 2003). Despite the historical and linguistic variations between Tennessee's equal protection guarantee—Article I, section 8 and Article XI, section 8 of the Tennessee Constitution—and the Fourteenth Amendment to the United States Constitution, the protections they offer are the same. *Id*. "The concept of equal protection . . . guarantees that 'all persons similarly circumstanced shall be treated alike.'" *Tennessee Small Sch. Sys. v. McWherter*, 851 S.W.2d 139, 153 (Tenn. 1993) (quoting *Doe v. Norris*, 751 S.W.2d 834, 841 (Tenn. 2003)).

In determining whether treating the two groups differently is constitutional, "one of three standards of scrutiny applies, depending on the nature of the right asserted or the class of persons affected: (1) strict scrutiny; (2) heightened scrutiny; or (3) reduced scrutiny, applying the rational basis test." *Gallaher*, 104 S.W.3d at 460. Strict scrutiny applies when a "suspect class" is treated differently under the law than others who are similarly situated. *Id*. A suspect class is one that has been "saddled with such disabilities . . . or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian process." *State v. Tester*, 879 S.W.2d 823, 828 (Tenn. 1994) (quoting *San Antonio Independent School Dist. v. Rodriguez*, 411 U.S. 1, 27 (1973)).

---

[16] Tenn. Code Ann. § 40-11-122 permits criminal defendants to satisfy bail, in lieu of cash, in one of three ways:

(1) Real estate situated in this state with nonexempt unencumbered equity owned by the defendant or the defendant's surety worth one and one-half (1 1/2) times the amount of bail set. If the bail bond is secured by real estate, the defendant or the defendant's surety shall execute a deed of trust conveying the real estate in trust to the clerk who shall immediately file the deed of trust in the office of the register of the county in which the real estate is situated. The costs of preparation of the deed of trust and recordation shall be paid by the defendant;

(2) A written under taking signed by the defendant and at least two (2) sufficient sureties, and approved by the magistrate or officer. Sureties under this section shall not be professional bondsmen or attorneys; or

(3) A solvent corporate surety or sureties or a professional bail bondsman as approved, qualified or regulated by §§ 40-11-101–40-11-144 and part 3 of this chapter. No bond shall be approved unless the surety on the bond appears to be qualified.

Although defendants in child support enforcement actions do not fit the definition of a suspect class, strict scrutiny still applies if a fundamental right is at stake. *Tester*, 879 S.W.2d at 828 (citations omitted). At issue here is the right to pretrial release on bail which is a fundamental right in Tennessee.[17] *Burgins*, 464 S.W.3d at 304. Therefore, the court must have a compelling reason for placing civil defendants at a disadvantage when the appearance bond is at issue. *See State v. Smoky Mountain Secrets, Inc.*, 937 S.W.2d 905, 912 (Tenn. 1996). In this case, we find no rational basis for treating civil defendants differently from criminal defendants, much less a compelling one.

Pretrial imprisonment advances two government interests under the Tennessee Criminal Code. Primarily, it secures the defendant's appearance at trial but it also protects the public from potentially dangerous offenders. *See* Tenn. Code Ann. § 40-11-118(b). For this reason, when setting bail in a criminal case, the court must consider factors which assess the likelihood that the defendant will flee and whether the defendant poses a risk of danger to the community—factors such as the nature of the alleged offense and likely sentence upon conviction, the defendant's community ties, and past history of failing to appear for court proceedings. *Id*.

Defendants in child support enforcement actions, by virtue of their alleged wrong—failure to pay a financial obligation—pose no risk of danger to the public. Moreover, a civil defendant, who is not facing the possibility of a prison sentence upon conviction, has less incentive to flee than a criminal defendant. Therefore, considering the alleged civil contemnor's risk to the community and incentive to flee, it is illogical for the court to make it ***more difficult*** for a defendant in a child support enforcement action to secure pretrial release than it would for a criminal defendant.

Because the court had no rational basis for making it more difficult for Father, a defendant in a civil child support enforcement action, to obtain pretrial release than a criminal defendant, we have determined that the trial court's decision to require a cash-only bond violated Father's right to equal protection of the law under both the state and federal constitutions. Accordingly, in order to comport with the Equal Protection guarantees of both constitutions in a child support enforcement action, the court must follow the applicable bail statutes set forth in the Release from Custody and Bail Reform Act of 1978, Tenn. Code Ann. §§ 40-11-101 to -144, unless the bail statute or statutes conflict with § 36-5-101(f)(2), in which case § 101(f)(2) controls. This mandate includes

---

[17] This fundamental right is derived from Article I, section 15 of the Tennessee Constitution, *Burgins*, 464 S.W.3d at 304, and as discussed *supra*, this right applies in civil cases. However, the right to pretrial release on bail is not a fundamental right under the United States Constitution; therefore, the rational basis test applies under the federal Equal Protection Clause. *See id*. Nevertheless, we have determined that the court did not have a legitimate reason, much less a compelling one, for making it more difficult for Father to obtain pretrial release than a criminal defendant.

Tenn. Code Ann. § 40-11-122, which permits the defendant to satisfy bail in one of three ways in lieu of cash, and § 40-11-118, which requires the court to set bail "*as low as the court determines is necessary to reasonably assure the appearance of defendant as required.*" Tenn. Code Ann. § 40-11-118.[18]

### III.    DUE PROCESS

We also find a trial court's discretion to require a cash-only bond is constrained by the due process guarantees of the United States and Tennessee Constitutions.

"The interest in securing . . . the freedom 'from bodily restraint,' lies 'at the core of the liberty protected by the Due Process Clause'" of the Fourteenth Amendment to the

---

[18] Tenn. Code Ann. § 40-11-118 provides in pertinent part:

(a) Any defendant for whom bail has been set may execute the bail bond and deposit with the clerk of the court before which the proceeding is pending a sum of money in cash equal to the amount of the bail. Upon depositing this sum, the defendant shall be released from custody subject to the conditions of the bail bond. Bail shall be set as low as the court determines is necessary to reasonably assure the appearance of the defendant as required.

(b) In determining the amount of bail necessary to reasonably assure the appearance of the defendant while at the same time protecting the safety of the public, the magistrate shall consider the following:

   (1)  The defendant's length of residence in the community;
   (2)  The defendant's employment status and history and financial condition;
   (3)  The defendant's family ties and relationships;
   (4)  The defendant's reputation, character and mental condition;
   (5)  The defendant's prior criminal record of appearance at court proceedings, record of flight to avoid prosecution or failure to appear at court proceedings;
   (6)  The nature of the offense and the apparent probability of conviction and likely sentence;
   (7)  The defendant's prior criminal record and the likelihood that because of that record the defendant will pose a risk of danger to the community;
   (8)  The identity of responsible members of the community who will vouch for the defendant's reliability; however, no member of the community may vouch for more than two (2) defendants at any time while charges are still pending or a forfeiture is outstanding; and
   (9)  Any other factors indicating the defendant's ties to the community or bearing on the risk of the defendant's willful failure to appear.

Factor five will require the court to consider the defendant's failure to appear in past child support enforcement proceedings. Factor seven is irrelevant in a child support enforcement action and need not be considered.

United States Constitution and Article I, section 8 of the Tennessee Constitution. *Turner v. Rogers*, 564 U.S. 431, 445 (2011);[19] *State ex rel. Anglin v. Mitchell*, 596 S.W.2d 779, 786 (Tenn. 1980) ("The 'law of the land' proviso of our constitution is synonymous with the 'due process of law' provisions of the federal constitution."). Like criminal contempt actions, civil contempt actions may lead to imprisonment, and thus, civil contempt implicates due process. *Turner*, 564 U.S. at 441. That said, criminal contemnors are entitled to more procedural protections than civil contemnors; however, this does not mean that civil contemnors are wholly without due process protections. *Id*. at 442. The differences in the protections offered to each lie in the differences between the two types of contempt. *Id*. As the Tennessee Supreme Court explained:

> Civil contempt is remedial in character and is applied when a person refuses or fails to comply with a court order. A civil contempt action is brought to force compliance with the order and thereby secure private rights established by the order. When a trial court orders imprisonment after finding civil contempt, the confinement is remedial and coercive in nature, designed to compel the contemnor to comply with the court's order. Consequently, compliance with the order will result in the contemnor's immediate release from confinement. It has long been said that in a civil contempt case, the contemnor "carries the keys to his prison in his own pocket."
>
> Criminal contempt, by contrast, is designed "to preserve the power and vindicate the dignity and authority of the law and the court as an organ of society." Sanctions for criminal contempt are generally both punitive and unconditional in nature, designed to punish past behavior, not to coerce directly compliance with a court order or influence future behavior. Therefore, when a court imposes a definite term of confinement for conduct constituting criminal contempt, the contemnor cannot shorten the term by agreeing not to continue in the behavior that resulted in his confinement.

---

[19] As issue in *Turner v. Rogers* was an indigent's right to counsel at a civil contempt proceeding when "loss of personal liberty through imprisonment was at risk."

> The "private interest that will be affected" argues strongly for the right to counsel that Turner advocates. That interest consists of an indigent defendant's loss of personal liberty through imprisonment. The interest in securing that freedom, the freedom "from bodily restraint," lies "at the core of the liberty protected by the Due Process Clause." *Foucha v. Louisiana*, 504 U.S. 71, 80, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992). And we have made clear that its threatened loss through legal proceedings demands "due process protection." *Addington v. Texas*, 441 U.S. 418, 425, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979).

*Id*. at 445.

*Baker v. State*, 417 S.W.3d 428, 436 (Tenn. 2013) (citations omitted). Because imprisonment for criminal contempt is "punitive and unconditional in nature," alleged criminal contemnors are entitled to some of the same constitutional protections allowed criminal defendants, such as the presumption of innocence and proof of guilt beyond a reasonable doubt. *See id.*

To the contrary, imprisonment for civil contempt is conditional. *Id.* A civil contemnor "carries the keys to his prison in his own pocket." *Id.*; *Watts v. Watts*, 519 S.W.3d 572, 577 (Tenn. Ct. App. 2016). But, this legal fiction presumes that the civil contemnor has the present ability to pay the amount required. *Watts*, 519 S.W.3d at 577; *Ahern v. Ahern*, 15 S.W.3d 73, 79 (Tenn. 2000) (citing Tenn. Code Ann. § 29-9-104). Thus, before imprisoning a civil contemnor, the court must ensure that the contemnor actually possesses the key to obtain his release, which is accomplished through an "ability to pay" determination. *See Turner*, 564 U.S. at 445. Because the "ability to pay" question "marks the dividing line between civil and criminal cases," ***a determination of the defendant's ability to pay is the single most important due process protection in civil contempt cases***. *See id.* And, "[g]iven the importance of the interest at stake,"— "loss of personal liberty through imprisonment,"—"it is obviously important to assure accurate decision making in respect to the key 'ability to pay' question." *Id.*

Here, the trial court required a cash-only bond of $13,413.45, which was the alleged amount of Father's arrearage. And, the "Order of Attachment" ordered that the bond be forwarded immediately, upon payment, to the State Disbursement Unit in satisfaction of Father's arrears. As such, the court used Father's imprisonment as a means to coerce Father's compliance with the child support order. However, in so ordering, the trial court had no competent evidence of what Father actually owed in child support or any evidence of Father's ability to pay the arrearage. Because the court did not properly ensure that Father possessed the key to his prison cell, the court violated Father's right to due process under the Fourteenth Amendment to the United States Constitution and Article I, section 8 of the Tennessee Constitution. *See id.*

## IV.    TENN. CODE ANN. § 36-5-101(f)(2)

We have also determined that the trial court erred in requiring a cash-only appearance bond because it misconstrued and misapplied Tenn. Code Ann. § 36-5-101(f)(2). This is evident considering that the cash-only "appearance bond" was used as a means to collect Father's child support arrearage—to coerce his compliance—instead of assuring his appearance at future court hearings. This conclusion is buttressed by the fact that the trial court: 1) set the "appearance bond" at the amount of the alleged arrears and 2) ordered that the cash bond be forfeited immediately upon payment and applied to the child support order.

Tenn. Code Ann. § 36-5-101(f)(2) affords the trial court the discretion to set the type and amount of the appearance bond and to determine whether it should be forfeited if the defendant fails to appear at a future hearing. This section of the statute also authorizes the trial court to set the appearance bond up to the amount of the alleged arrears but the amount of the alleged arrears is the maximum that may be set; it should not be the default amount for assuring the defendant's appearance at future hearings.[20] Instead, as discussed *supra*, the amount of the appearance bond should be set as low as reasonably necessary to ensure the defendant's appearance at trial, and consequently, must be based on evidence regarding the defendant's financial condition and his status as a flight risk. *See* Tenn. Code Ann. § 40-11-118. Here, the trial court required a cash-only bond of $13,413.45, the maximum allowed under the statute, without a proper evidentiary foundation.

As for the forfeiture provision, Tenn. Code Ann. § 36-5-101(f)(2) expressly states, "[i]f the obligor parent ***thereafter fails to appear*** or fails without good cause to comply with the order of support, ***such bonds may be forfeited*** and the proceeds from the bonds paid to the court clerk and applied to the order of support." *Id*. (emphasis added). Thus, the statute clearly establishes two conditions precedent to forfeiture of a bond. And, because the statute states that the bonds ***may be*** forfeited, a forfeiture of a bond is not mandated. When the court ordered the immediate forfeiture of the bond, Father had not failed to appear. Nor, did the court have competent evidence before it to determine whether Father had failed ***without good cause*** to comply with the order of support. *See id*. Therefore, when the "Order of Attachment" was issued, there was no basis for the trial court to order the forfeiture of the bond.

Bond in a child support enforcement action is reviewed under an abuse of discretion standard. *See id*. Thus, the type and amount of bond imposed by the trial court constituted a discretionary decision. *See id*. "Discretionary decisions must take the applicable law and the relevant facts into account." *Lee Med. Inc.*, 312 S.W.3d at 524. Consequently, discretionary decisions should have a factual basis that is supported by evidence in the record and the trial court should have properly identified and applied the most appropriate legal principles. *Id*. at 524 (internal citations omitted).

The trial court's decision to require a cash-only bond at the maximum amount allowed under § 101(f)(2), which was to be forfeited immediately upon payment, was not based on a proper application of the statute, nor was it supported by an evidentiary foundation. Accordingly, the trial court exceeded its discretion when it required the immediate forfeiture of a cash-only appearance bond in the amount of $13,413.45. *See*

---

[20] The court may set a bond "of not less than two hundred fifty dollars ($250) or, in the discretion of the court, up to the amount of arrears . . . ." Tenn. Code Ann. § 36-5-101(f)(2).

*Gooding*, 477 S.W.3d at 783 (If we determine that the trial court's judgment is not based on the applicable legal principles or relevant facts, an abuse of discretion may be found.).

## IN CONCLUSION

We hold that the trial court erred in requiring a cash-only appearance bond because by doing so it violated Father's constitutional rights under Article I, section 15 of the Tennessee Constitution and under the equal protection guarantees of both the Tennessee and United States Constitutions. We also hold that the trial court erred because it violated Father's due process rights under both the state and federal constitutions by imposing a $13,413.45 cash-only bond as a means to collect a civil debt, and ordering that the bond be immediately applied in satisfaction of the alleged debt, without an evidentiary hearing. Moreover, the trial court erred in requiring a cash-only appearance bond because it misconstrued the applicable statute, Tenn. Code Ann. § 36-5-101(f)(2), as allowing it to use the appearance bond solely as a means to collect the alleged arrears, rather than as a means to ensure Father's appearance for legal proceedings. Therefore, because the trial court failed to identify and apply the appropriate legal principles, both statutory and constitutional, and its decision was not supported by an evidentiary foundation, the decision constituted an abuse of discretion. Accordingly, the judgment of the trial court is reversed, the amount of bond shall be $1,000, which Father may post with sufficient sureties, and the case is remanded for further proceedings as may be necessary.

Costs of appeal are assessed against the State of Tennessee.

_____
FRANK G. CLEMENT JR., P.J., M.S.

- 22 -